# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 02-4356, 03-1005 & 03-1232

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DOUGLAS N. PEARSON and
ARTHUR M. HAWKINS,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Southern District of Illinois.
No. 01 CR 30006—**David R. Herndon**, *Judge.*

———————

ARGUED MAY 27, 2003—DECIDED AUGUST 14, 2003

———————

Before ROVNER, DIANE P. WOOD, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Arthur Hawkins and Douglas Pearson were convicted of wire fraud and conspiracy to commit wire fraud based on their participation in a bribery scheme that facilitated the distribution of their company's defective batteries. Hawkins and Pearson appeal their convictions, arguing, among other things, that they should not have been tried on a superceding indictment that was filed outside the relevant statute of limitations, their case should not have been tried in the Southern District of Illinois, they were prejudiced by certain discovery

rulings of the district court, and the district court improperly limited their ability to examine a key witness at trial. We reject all of their arguments and affirm the judgment of the district court in all respects.

## I. BACKGROUND

Arthur Hawkins and Douglas Pearson were officers of Exide Corporation, a battery manufacturer. Hawkins was the CEO and Chair of the Board of Directors, while Pearson served as Executive Vice President of Sales and Marketing and later as President of North American Operations. In 1993, Exide bid on a contract to manufacture DieHard batteries for Sears. Exide's bid contained a promise of "space age technology," and it stated that Exide's DieHard batteries would contain silvium II (silver additive), high utilization paste, and one-inch breed lugs. In April 1994, Exide was awarded the DieHard contract.

Despite Exide's promises, the batteries it manufactured contained only trace amounts of silver, the high utilization paste did not add any value to the battery, and the one-inch lug created a design flaw. As early as October 1994, soon after the batteries were rolled out in Sears stores, Exide officials were warned of significant quality problems with the batteries. As a result, Sears indicated to Exide that it was in jeopardy of losing the DieHard business. By the end of October, Exide went into approximately 700 stores nationwide to remove defective batteries from the shelves.

In order to keep the lucrative Sears contract, Exide bribed Gary Marks, Sears's battery buyer. Beginning in March 1995 and continuing through February 1996, Exide made several payments of approximately $10,000 each to Marks. At first, Joseph Calio, Senior Vice President of Sales and Marketing for Exide, gave the bribes to Marks. After Calio complained about making the payments, Exide sent the bribes to Marks's phony consulting company,

DG Consulting, by check or wire. Marks left Sears in July 1997.

In April 1998, Hawkins informed Marks that Calio had implicated Marks in an investigation by the Florida Attorney General's Office into the Exide bribery scheme. In order to cover up their arrangement, Hawkins and Marks concocted a phony consulting agreement between Exide and DG Consulting and created supporting backdated documents to substantiate the bribe payments. Hawkins paid Marks $15,000 in spring of 1999 and an additional $10,000 later that fall for Marks's participation in the cover-up scheme and for his execution of the false cover-up documents.

In January 2001, Hawkins and Pearson were charged in a two-count indictment with wire fraud and conspiracy to commit wire fraud. The indictment, which was filed under seal, charged that the batteries failed testing standards and that Exide falsified internal quality assurance reports to hide latent manufacturing defects. It also charged that Exide supplied the defective batteries to Sears distribution centers, causing defective batteries to be distributed nationwide to consumers, and defendants failed to recall batteries that were known to be defective. In addition, there were allegations that Exide falsely advertised that the batteries were manufactured with certain "proprietary features" when the batteries either did not contain the features or they added nothing to the durability or quality of the batteries. Finally, according to the indictment, after the defective batteries were in the stores, defendants made unlawful payments to Marks in an attempt to influence his independent judgment and to promote the business arrangement with Sears, and then concealed the unlawful

payments by causing corporate financial records to be falsified.[1]

After the original indictment was returned against Hawkins and Pearson in January 2001, two superceding indictments were filed in open court in March 2001, then in July 2001. Hawkins and Pearson were tried on the second superceding indictment beginning on March 18, 2002. Following approximately three months of trial, a jury convicted Hawkins and Pearson on both counts. Hawkins was sentenced to 120 months' imprisonment, a three-year term of supervised release, and a fine of $1 million, while Pearson received a sentence of 64 months' imprisonment, a two-year term of supervised release, and a fine of $150,000. Defendants appeal.

## II. ANALYSIS

Hawkins and Pearson have taken a kitchen-sink approach to their appeal, filing separate briefs (with voluminous appendices) and together raising over a dozen distinct issues, each with their own sub-contentions. Neither challenges the sufficiency of the evidence to support their conviction. In the face of the avalanche of issues they have raised, we will focus here on defendants' most substantive contentions.

---

[1] In March 2001, Marks and Calio pled guilty to wire fraud and signed plea agreements with the government. In December 2001, Sears Automotive Marketing Services, Inc., a subsidiary of Sears, entered into a pretrial diversion agreement in which the U.S. Attorney's Office agreed not to prosecute it in exchange for a payment of $62.6 million.

A.  Superceding Indictment

Defendants first argue they were tried under a second superceding indictment that, because it was returned outside the statute of limitations period and did not relate back to the original indictment, was time-barred. We review the district court's ruling regarding the statute of limitations de novo. *United States v. Anderson*, 188 F.3d 886, 888 (7th Cir. 1999). The original indictment against defendants, which included a wire-fraud count for the wiring of money on January 31, 1996, was filed January 19, 2001, within the five-year statute of limitations. *See* 18 U.S.C. § 3282. Subsequently, a first superceding indictment was returned on March 22, 2001, and a second superceding indictment was returned July 19, 2001. Although only the original indictment was filed within the five-year limit, "a superceding indictment that supplants a still-pending original indictment relates back to the original indictment's filing date so long as it neither materially broadens nor substantially amends the charges initially brought against the defendant." *United States v. Ross*, 77 F.3d 1525, 1537 (7th Cir. 1996). Defendants have two statute of limitations complaints about the indictments: the original indictment was filed under seal and the later indictments do not relate back to the original indictment.

We first address defendants' concern that the original indictment was sealed. Defendants argue that despite the fact that filing an indictment within the statute of limitations period tolls the running of the statute of limitations, it should not have been tolled in this case because the original indictment was filed under seal. Federal Rule of Criminal Procedure 6(e)(4) provides that a court "may direct that the indictment be kept secret until the defendant is in custody or has been released pending trial." Rule 6 does not require the statute of limitations analysis to be altered when an indictment is sealed, and we see no reason why, in a case such as this where an open indictment was filed only

two months later, the statute of limitations should continue to run after a sealed indictment has been returned. *See United States v. Thompson*, 287 F.3d 1244, 1251 (10th Cir. 2002); *United States v. Edwards*, 777 F.2d 644, 647 (11th Cir. 1985); *United States v. Watson*, 599 F.2d 1149, 1154 (2d Cir. 1979).

Hawkins also complains that because the original indictment has remained under seal, his counsel has never been able to determine whether the first superceding indictment relates back to the original indictment. The district court conducted an *in camera* comparison of the original indictment to the first superceding indictment and determined that the only difference between the two was the removal in the latter of the identity of an unindicted coconspirator. Our review confirms this minor change, which, since it does not alter or amend the charges against the defendants in any way, does not offend the statute of limitations.

This is not to say, however, that it was proper for the indictment to indefinitely remain under seal in the district court. Pearson and the government acknowledge that the identity of the coconspirator named in the original indictment has been publicly revealed. This court has repeatedly recognized the paramount importance of providing public access to court proceedings, especially in criminal matters. *See, e.g., In re Associated Press v. Ladd*, 162 F.3d 503, 509-10 (7th Cir. 1998); *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994). At the very least, once the identity of the unindicted coconspirator became known, the indictment should have been unsealed, and it is, as of this date, unsealed.[2]

---

[2] We remind litigants that under Seventh Circuit Operating Procedure 10, "[e]xcept to the extent portions of the record are required to be sealed by statute . . . every document filed in or by

(continued...)

Defendants' second statute of limitations argument is that changes made to the conspiracy count in the second superceding indictment materially broadened the charge, preventing it from "relating back" to the original indictment, and leaving it time-barred. The second superceding indictment modified the end date of the conspiracy from February 1996 to September 2000 and added three overt acts which occurred during that time. Defendants argue that the three acts—Hawkins's preparation of Marks's false affidavit, his preparation of a phony consulting agreement, and his false testimony about the consulting agreement— were not part of the wire fraud conspiracy and thus expanded the alleged crime. However, "the fact that the 'central objective' of the conspiracy has been nominally attained does not preclude the continuance of the conspiracy." *United States v. Hickey*, 360 F.2d 127, 141 (7th Cir. 1966). Here, the uninterrupted success of the conspiracy turned on defendants' ability to continuously conceal the truth about the defective batteries from consumers and Exide shareholders. Hawkins's acts to prop up the scheme were an integral part of the continuing actions of deceit. We find that defendants were on notice of the charges pending against them because "the initial indictment informed appellant[s] in no uncertain terms that [they] would have to account for essentially the same conduct with which [they] were] ultimately charged in the superceding indictment," *United States v. O'Bryant*, 998 F.2d 21, 24 (1st Cir. 1993), and therefore the second superceding indictment did not violate the statute of limitations.

---

[2] (...continued)
this court (whether or not the document was sealed in the district court) is in the public record unless a judge of this court orders it to be sealed. Documents sealed in the district court will be maintained under seal in this court for 14 days, to afford time to request the approval required by . . . this procedure."

### B.  Venue

We next examine Pearson and Hawkins's arguments that venue was not proper in the Southern District of Illinois. We review claims of improper venue to determine "whether the government proved by a preponderance of the evidence that the crimes occurred in the district charged, viewing the evidence in the light most favorable to the government." *United States v. Ochoa*, 229 F.3d 631, 636 (7th Cir. 2000). Article III of the Constitution stipulates that "the Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," § 2, cl. 3, and the Sixth Amendment similarly requires that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." These Constitutional conditions also are echoed in Federal Rule of Criminal Procedure 18, which dictates that a criminal prosecution must occur "in a district in which the offense was committed." Because the wire fraud statute does not contain a specific statutory venue provision, the general venue provision for offenses that occur in more than one state or district, 18 U.S.C. § 3237(a), applies here: "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."

Defendants contend that the substantive wire fraud count should not have been tried in the Southern District of Illinois because the basis for that count, a wire transfer from a bank in the Eastern District of Pennsylvania to a bank in the Northern District of Illinois, did not originate in, pass through, or terminate in the Southern District of Illinois. In cases interpreting the application of § 3237(a), this court has held that "venue is only improper 'if the only acts that occurred in that district do not provide evidence of the elements of the charged crime.'" *United States v.*

*Ringer*, 300 F.3d 788, 792 (7th Cir. 2002) (quoting *Ochoa*, 229 F.3d at 636).

In *Ringer*, the defendant was charged with making false statements to federal officers in the Eastern District of Kentucky and was tried in the Southern District of Indiana. *Id.* at 790. We held that venue was proper in the Southern District of Indiana because, although the statements occurred elsewhere, they were intended to influence a trial set to occur in the Southern District of Indiana, and the materiality of the statements was an element of the crime. *Id.* at 792. Similarly, in *United States v. Frederick*, 835 F.2d 1211, 1212 (7th Cir. 1987), venue was proper in the Northern District of Illinois when a defendant was charged with witness tampering that occurred in the Southern District of Florida but was intended to affect a trial in the Northern District of Illinois. We explained that "[p]roper venue is not limited to districts where the defendants were physically present when they committed unlawful acts. So long as an overt act is intended to have an effect in the district where the case is finally brought, venue is proper." *Id.* at 1215.

In the instant case, defendants intended to defraud customers in the Southern District of Illinois. They were charged with wire fraud, including use of the wires to promote the sale of defective batteries through false advertising in the Southern District of Illinois. Moreover, the defective batteries themselves were distributed and sold in that district, and an audit of the battery quality conducted in the Southern District of Illinois initially uncovered the defects in the product. The Exide Corporation, a defendant in a companion case, was charged with similar crimes and pled guilty in the Southern District of Illinois.

These fraudulent activities conducted in the Southern District of Illinois provided critical evidence of the "intent to defraud," an element of the crime of wire fraud. *See*

*United States v. O'Brien*, 119 F.3d 523, 532 (7th Cir. 1997); *see also* 18 U.S.C. § 1343. The Supreme Court has emphasized that when analyzing venue, courts must inquire into the nature of the offense, *see United States v. Rodriguez-Moreno*, 526 U.S. 275, 280 (1999) (upholding venue in prosecution of firearm offense where crime of violence, an essential element of the firearm offense, occurred in the trial district), and Pearson and Hawkins's crime of wire fraud focused on defrauding and concealing their deceit of consumers, including those in the Southern District of Illinois.[3]

Hawkins also complains that venue was improper as to the conspiracy count. Both the sale of defective batteries and the broadcasting of advertisements in the Southern District of Illinois were overt acts that supported the charge of conspiracy to commit mail fraud. "As long as one overt act in furtherance of the conspiracy was committed in a district, venue is proper there." *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985). Venue for both the conspiracy and substantive wire fraud counts was proper in the Southern District of Illinois.

### C.   Discovery and Pretrial Rulings

Defendants also raise several objections to pretrial rulings by the district court, and we review their complaints keeping in mind that "[d]istrict courts have broad discretion in discovery matters." *Packman v. Chicago Tribune Co.*, 267

---

[3] Although neither party discusses the case, in *United States v. Pace*, 314 F.3d 344, 350 (9th Cir. 2002), the Ninth Circuit held that venue for a wire fraud offense may only "lie where there is a direct or causal connection to the . . . wires." This approach differs with the rubric we have established for analyzing venue in *Frederick*, *Ochoa*, and *Ringer*, and we decline to adopt the analysis outlined by the Ninth Circuit in *Pace.*

F.3d 628, 646 (7th Cir. 2001). We review discovery challenges for abuse of discretion, and "[w]e shall not reverse the district court's ruling absent a clear showing that the denial of discovery resulted in actual and substantial prejudice to [defendants]." *Id.* at 646; *see also United States v. Avery*, 208 F.3d 597, 601 (7th Cir. 2000). We note at the outset that the government maintained an open-file policy in this case, by which defendants, through their copy vendor, could copy all of the government's records, and the district court observed that defendants had "extraordinary access" to documents in this case. Furthermore, defendants have failed to show actual prejudice from any of the issues they have raised with the discovery process. Despite this fatal flaw, we will briefly discuss their contentions for the sake of completeness.

We first review the district court's rejection of defendants' motion for a continuance. In late January 2002, Pearson moved for a trial continuance, the third such request made by defendants. Defendants argue that they needed more time to prepare for trial because 86 boxes of discovery material had not yet been copied by defendants' copy vendor, and because of the large volume of documents. Importantly, defendants do not argue that the government did not make the 86 boxes of documents available to them, only that the log maintained by the U.S. Postal Inspector's Office to account for the government boxes being taken for copying by defendants' copy vendor indicated that 86 boxes had not yet been copied.[4] After providing defendants free and open access to the documents through its open-file policy, the government was under no obligation to ensure

---

[4] Defendants also complain about an additional 23 boxes that the log indicates were received by defendants' copy vendor, but of which defendants did not receive copies. This seems to be a problem more properly addressed to the copy vendor, not to the court.

that defendants took advantage of the open files by actually copying or reviewing each box. Further, although there was a large amount of discovery to review in preparation for trial, defendants had one year from the date of the first superceding indictment and seven and one-half months from the date of the second superceding indictment to prepare for trial. We do not find any abuse of discretion in the district court's denial of defendants' motion for a continuance, as defendants had adequate time and access to discovery in order to prepare for trial.

Second, we consider defendants' argument that the district court should have required the government to provide defendants with a list of potential witnesses and a list of its trial exhibits. Despite the fact that Federal Rule of Criminal Procedure 16 addresses many of the defendants' concerns, their briefs are noticeably silent as to the Rule's provisions. Federal Rule of Criminal Procedure 16(a)(1)(E) provides:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents . . . or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant.

As we have noted before, the law is clear that neither the Constitution nor Rule 16 entitles a defendant to a list of all prospective witnesses before trial in a noncapital case. *See United States v. Napue*, 834 F.2d 1311, 1317 (7th Cir.

1987).[5] The district court may require the government to provide a witness list, *see United States v. Edwards*, 47 F.3d 841, 843 (7th Cir. 1995); *United States v. Jackson*, 508 F.2d 1001, 1006 (7th Cir. 1975), but, as Congress recognized when it declined to include such a requirement in Rule 16, a district court may also choose not to exercise that prerogative, since providing a witness list might in some cases discourage witnesses from testifying or lead to "'improper contact directed at influencing their testimony.'" *Napue*, 834 F.2d at 1317 (quoting H.R. CONF. REP. NO. 94-414 (1975), *reprinted in* U.S.S.C.A.N. 674, 713, 716). With respect to the provision of an exhibit list, defendants admit that they received copies of the exhibits themselves, and they limit their complaint to the lack of a list of the exhibits to aid in their organization for trial. As noted earlier, Rule 16 requires the government to make certain physical objects and documents available for inspection and copying, but it is silent as to any responsibility by the government to provide an organizational guide to those materials for defendants. Although provision of an exhibit list likely would have made this trial more efficient for all involved, and we certainly encourage parties to exchange them pretrial, we cannot find the district court abused its discretion for failing to order the government to furnish lists that Rule 16 does not require it to provide.[6]

---

[5] We note that defendants do not argue that the government failed to comply with the Jencks Act, 18 U.S.C. § 3500(b), which requires the government, upon defendants' motion, to produce statements made by any of its witnesses which the particular witnesses signed, adopted, or approved, and which pertain to their testimony at trial. Instead, defendants' argument focuses on the provision of a list of witnesses before they took the stand.

[6] Because the government did provide the district court with a courtesy copy of an exhibit list, defendants also argue that the

(continued...)

Next, defendants argue that the district court erred in rejecting their motion to compel the production of approximately 3800 allegedly-defective batteries that the government obtained from Sears. Defendants allege that, despite the fact that the batteries were never introduced at trial, the government's refusal to turn over the batteries compromised their ability to defend against the accusation that the batteries were defective because they could not have the batteries tested to determine their quality. The batteries were never analyzed by any party, and the government contends that they could not have been tested because their condition had deteriorated to a point that made reliable testing impossible. Defendants disagree and argue that testing would have been merely difficult, not impossible. Rule 16 requires the government to provide access to objects "which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at trial." In *United States v. Armstrong*, 517 U.S. 456, 462 (1996), the Court held that "material to the preparation of the defendant's defense" means "the defendant's response to the Government's case in chief," and does not include materials deemed by defendants to be necessary to prove their own defense theory or to challenge the pros-

---

[6]  (...continued)
government's failure to provide them with the same list constituted *ex parte* communication in violation of *United States v. Culp*, 7 F.3d 613 (7th Cir. 1993). *Culp* rightly noted that the government has a professional obligation under ABA Model Rule of Professional Conduct 3.5(b) to provide a copy to defense counsel of "any papers, documents or exhibits he files with the court in order to avoid an *ex parte* contact with the judge." *Id.* at 616 n.1. Despite the fact that defendants' *ex parte* argument misses the mark—no information was hidden from them since they had copies of the exhibits themselves—we emphasize that simply providing a copy of the exhibit list to the defendants would have avoided this unnecessary dispute.

ecutor's conduct of the case. Defendants argue that even though the 3800 batteries were not part of the government's case, test results could have been used to respond generally to the government's allegations that the batteries were defective. But even if we assume that the batteries could have been tested and we assume that defendants could have used test results to defend against the government's case in chief under *Armstrong*, it is difficult to imagine how defendants could have suffered actual prejudice from the lack of access to the batteries. When Exide pled guilty, it stipulated that the batteries were manufactured and distributed with latent defects. On the other hand, we fail to see what harm could have come from the government turning over the batteries. But given the uncertainty about the condition of the batteries and Exide's stipulation that the batteries were in fact defective, we do not think the district court's denial of defendants' motion to compel the batteries rises to an abuse of discretion.[7]

Finally, defendants allege that the government improperly failed to turn over several documents in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In order to establish a *Brady* violation, defendants must show "(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." *United States v. Silva*, 71 F.3d 667, 670 (7th Cir. 1995). Defendants offer three "examples" of *Brady* violations, but in each case fail to articulate why the evidence sought was not available to defendants

---

[7] Defendants also object to the district court's refusal to compel production of a CD-Rom holding battery data. The CD-Rom contained an inventory of manufacturing codes and internal serial numbers that were placed on the batteries. We do not see how this information is relevant to defendants' case, and we find no error in the district court's decision to deny defendants' motion to compel.

through the exercise of due diligence. *See United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002). They first point to the government's refusal to turn over the grand jury testimony of Tim Findlay, who, according to Pearson, coordinated an Exide management buy-out plan to purchase Kmart's auto centers. Putting aside their failure to explain the relevance of Findlay's grand jury testimony to the case at bar, the district court found, and defendants do not dispute, that Findlay was available to be called as a witness for the defense. Defendants' other *Brady* allegations are equally unconvincing. They posit that the government should have turned over the debriefing notes of a co-defendant who pled guilty and agreed to cooperate with the government, and that it should have provided the grand jury testimony of defendant Hawkins's son, Lee Hawkins. These strike us as witnesses who would be easily available to defendants, and defendants have not explained to the contrary. Under these circumstances, we find no error under *Brady* in the district court's refusal to order the government to turn over these materials.

D.  Impeachment Evidence

Defendants further contend that the district court erred when it did not allow defendants to introduce certain documents in their cross-examination of Joseph Calio. Evidentiary rulings by the district court are reviewed by this court for abuse of discretion. *United States v. Nedza*, 880 F.2d 896, 903 (7th Cir. 1989). Calio generally testified that he was obtaining money for bribes through wire transfers from Exide and covering it up by signing backdated documents that provided false reasons for the wires. He was also a key witness against Pearson, and he described Pearson's active role in the conspiracy. At trial, defendants attempted to introduce documents that they claim would have provided a legitimate explanation for the wire trans-

fers that Calio testified were fictitious. These documents included airline tickets for European travel in 1995, a passport showing that Calio landed in London in 1995, and an American Express statement including a charge for plane tickets, which defendants apparently sought to support a theory that Calio used the money wired to him by Exide to purchase a personal vacation to Europe rather than to bribe Marks. The government argued that there was no connection between the documents and the bribe money wired to Calio. The district court agreed, finding the documents would be very misleading to the jury, and relied on Federal Rules of Evidence 403 and 608(b) to exclude them. Given the district court's factual finding that the documents were unrelated to the fraudulent transfer, we find no abuse of discretion in the district court's exclusion of the potentially misleading documents. *See United States v. Thomas*, 321 F.3d 627, 630 (7th Cir. 2003) ("The balancing of probative value and prejudice is a highly discretionary assessment, and we accord the district court's discretion great deference, only disturbing it if no reasonable person could agree with the ruling."); *Chase v. Consol. Foods Corp.*, 744 F.2d 566, 571 (7th Cir. 1984) ("Since the trial judge has the feel of the jury in a way that the appellate court cannot, his ruling [excluding potentially misleading evidence] will rarely be disturbed on appeal.").

Defendants also contend that the court erred in ending the defense's examination of Calio. The court excused Calio from the witness stand after a hearing in chambers in which the government argued that Pearson's attorney suggested to Calio's counsel that Calio may have breached his plea agreement with the government, that he should assert his Fifth Amendment privilege against self-incrimination, and the defense would then move to strike all of Calio's testimony. At the time the district court ended Calio's testimony, Calio had testified as a government witness for three days, including substantial cross-examination

by defendants, and had then been recalled by defendants as a witness for the defense. Defendants claim that, as a result of the court's ruling, they did not have the opportunity to examine Calio as to certain conversations he had with government witness Rick Randalls, although defendants do not explain the significance of this evidence or why it had not been discussed with the witness earlier.

During the three and one-half days Calio had been on the stand, the defense had ample opportunities to impeach Calio on many different issues. "Merely cumulative evidence is excludable, as having little probative value, Fed. R. Evid. 403; merely cumulative impeachment evidence likewise." *United States v. Boyd*, 55 F.3d 239, 246 (7th Cir. 1995). Defendants thoroughly questioned Calio on issues including discrepancies in his accounts of alleged meetings with the defendants, misstatements in a deposition with the Florida Attorney General, tax evasion, his possible bias against Pearson including statements that he "hated Pearson" and had commented on Pearson's sexual orientation, and the fact that he received a deal from the government for his testimony. They do not explain why additional testimony from Calio would have been anything but cumulative. "Determining whether testimony is cumulative rests within the sound discretion of the district court," *United States v. Gardner*, 211 F.3d 1049, 1055 (7th Cir. 2000), and we find no abuse of discretion by the district court in ending Calio's testimony.

Hawkins and Pearson raised a number of other issues in their appeals, and although we have considered each of these arguments, we conclude that they are without merit and are of insufficient importance to discuss here.

### III.  CONCLUSION

Accordingly, we AFFIRM the convictions and sentences of the defendants.


A true Copy:
    Teste:


_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*