# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 03-2199 & 03-2232

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JIMMY DOYLE WREN and CHARLES YARBOR,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 163-3,4—**Charles P. Kocoras**, *Chief Judge.*

———————

ARGUED FEBRUARY 27, 2004—DECIDED APRIL 14, 2004

———————

Before EASTERBROOK, MANION, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Jimmy Doyle Wren, Charles Yarbor, and two codefendants were charged with conspiring to unlawfully transport firearms in interstate commerce, in violation of 18 U.S.C. § 371. A jury trial on the charges resulted in guilty verdicts, and Wren and Yarbor were both sentenced to terms of 60 months. Their appeals have been consolidated for our consideration.

We review the evidence in the light most favorable to the government, and doing so reveals that Yarbor and codefendants Louis Rowe and Julius Sangster conspired to obtain firearms from Wren, a federally licensed firearms dealer in Mississippi, and transport them to Chicago for resale at a profit. They obtained the firearms by using false identification and several female straw purchasers.

Sangster, who had entered a plea of guilty, agreed to cooperate with the government. He testified at trial that Yarbor and Rowe told him about their activities and asked if he was interested in joining them in exchange for a share of the profits. He was, and in May 1996 the three went to Mississippi. Yarbor brought along crack cocaine, which he sold in Mississippi. The three then met Wren at a hospital parking lot in Grenada, Mississippi, a town on I-55 (a direct route from downtown Chicago) about 80 miles south of Memphis, Tennessee. Rowe told Wren that Sangster was his brother, who had just been released from prison, and that Sangster would soon be taking over for Rowe because Rowe was about to go to jail himself. Wren provided blank Alcohol, Tobacco and Firearms (ATF) forms 4473, which the men filled out using false information. Later that day they again met with Wren at the parking lot. At this time Wren delivered an SKS rifle and a 2.9mm handgun. Yarbor wrapped the guns in duct tape and concealed them under the back bumper of the car. Yarbor, Rowe, and Sangster drove the guns to Chicago, where Yarbor sold them to a member of the Gangster Disciples street gang.

After this trip Rowe was incarcerated, and Sangster and Yarbor began to make the trips to Mississippi to obtain the guns. In general, they followed the same procedure as before. Because Sangster was a convicted felon he could not fill out the ATF forms using his own name. He used an alias—Johnny Ray Hall—or he had various women fill out the forms for him. The forms were presented to Wren, who did not ask for identification. From May 1996 until January

1997, Sangster made 9 trips to Mississippi and obtained between 70 to 80 guns from Wren. Yarbor accompanied Sangster on six of the nine trips.

During the summer of 1996, Sangster asked Yarbor to make another trip and Yarbor declined, explaining that he planned to go into a different business—selling drugs in Chicago. But, Yarbor said, he would go to Mississippi "when he got the chance." He did not make any more trips, but he did help Sangster find purchasers for the guns.

In August or September of 1996, Wren received an ATF "tracer" indicating that a gun purchased by Melinda Parker, one of the women working with the conspiracy, was recovered in connection with a murder investigation in Florida. Wren told Sangster and Yarbor about the tracer and suggested that they direct Parker to report her gun stolen. The tracer did not stop their activities, however; Wren continued to supply guns to Sangster until Sangster and Rowe had a falling out over past gun sales and Sangster stopped making trips to Mississippi. His last trip was in November 1996.

Two of the other women who were straw purchasers—Paulette Hayes and Rosie Ammus—testified at trial. They acknowledged that they never paid for or received any firearms themselves. Hayes said she filled out ATF forms and that Wren never asked her for identification. Ammus said she bought guns for Rowe and Sangster (they could not legally buy them themselves because they had criminal records).

In April 1997, Chicago police officers raided Rowe's residence. Despite the raid, Rowe, now out of jail, continued to buy guns from Wren and resell them in Chicago until August 1997, when his residence was raided a second time. The officers notified agents of the ATF about the raids. An ATF agent traced the guns and learned that 28 of them had traveled in interstate commerce and that 21 had come from a store owned by Wren.

Both Yarbor and Wren made statements to ATF agents. Yarbor told the agent about the trips to Mississippi, about selling crack cocaine in Mississippi, and purchasing guns to bring back to Chicago. He described the guns purchased on the trips, the prices paid, and the people in Chicago to whom the guns were sold. He admitting knowing that Sangster and Rowe were convicted felons who could not legally purchase firearms. He claimed that he stopped making trips in July 1996.

Wren made a statement to Tina Sherrow, an ATF agent, in April 1998 after she executed a warrant to search his business, the delightfully named "J.W.'s Second Amendment Sporting Goods Store." In the statement, Wren said he sold firearms to his codefendants but that he stopped selling to them when he learned that some of the guns were used in criminal offenses. Wren also traveled to Chicago in February 2002, pursuant to a grand jury subpoena. In preparation for his grand jury testimony he was given a written cooperation agreement, which he signed, and a grand jury statement prepared by an assistant United States attorney (AUSA). He was allowed to make any changes he wished to the statement before he signed it. The next day he read the statement to the grand jury after he was advised of his right to remain silent, to have a lawyer present, and of the ramifications of committing perjury.

Wren and Yarbor raise several issues on appeal. Wren contends that "venue and jurisdiction" were improper in the Northern District of Illinois, that he was promised immunity for his testimony before the grand jury, and that his statement was involuntary. He also contends that his sentence was improperly enhanced on the basis that the offense involved more than 50 firearms, that he had reason to know that the firearms would be used in another criminal offense, and that he obstructed justice by committing perjury at trial. He also says it was error for the district

court not to depart downward from the sentencing guidelines in his case. Yarbor contends that the statute of limitations expired before he was indicted, that the district court improperly refused to instruct the jury on his theory that he withdrew from the conspiracy or that the conspiracy terminated before February 13, 1997, which would mean that the statute of limitations had run. He also argues that it was error for the district court to conclude that he had two felony drug convictions prior to the commission of the present offense and to find that certain firearms involved in the offense were semiautomatic assault rifles within the meaning of the United States sentencing guidelines.

We turn first to Wren's contention that "venue and jurisdiction" were improper in the Northern District of Illinois. As to jurisdiction, federal courts have exclusive jurisdiction over offenses against the United States, 18 U.S.C. § 3231, which means, of course, that they in fact have jurisdiction. But federal criminal prosecutions must be brought in the district in which the offense was committed. Fed. R. Crim. P. 18; *United States v. Pearson*, 340 F.3d 459 (7th Cir. 2003). We review claims of improper venue only to determine "whether the government proved by a preponderance of the evidence that the crimes occurred in the district charged, viewing the evidence in the light most favorable to the government." *United States v. Ochoa*, 229 F.3d 631, 636 (7th Cir. 2000). When a crime is committed in more than one district, venue is proper in any district in which any part of the crime was committed. 18 U.S.C. § 3237(a). In a conspiracy case, venue is proper in any district where at least one overt act in furtherance of the conspiracy occurred. It is not necessary that the conspiracy was formed in the district, that the defendant himself carried out an overt act in the district, or even that the defendant entered the district. What is necessary is that one of the conspirators carried out an overt act in the district. *United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999).

As our recitation of the evidence reveals, the Northern District of Illinois was the site of a number of overt acts. Sangster, Yarbor, and Rowe transported firearms supplied by Wren to Chicago and resold them in Chicago. In Chicago, Rowe was found in possession of one of the firearms obtained from Wren. Wren does not seriously contend—nor could he—that the evidence was not sufficient to sustain a finding that he was a member of the conspiracy. Accordingly, venue was proper in the Northern District of Illinois.

We turn next to Wren's contention that he should have prevailed on his motion to suppress statements for which he claims he was granted immunity. In connection with a motion to suppress, we review questions of law *de novo* and questions of fact for clear error. *United States v. Peters*, 153 F.3d 445 (7th Cir. 1998). We will conclude that a district court's factual finding is clearly erroneous only if we are left with the definite and firm conviction that a mistake has been made. *See United States v. Quinn*, 83 F.3d 917, 921 (7th Cir.1996). Generally speaking, a cooperation-immunity agreement is contractual in nature and subject to contract law standards. The language of the contract is to be read as a whole and given a reasonable interpretation. *United States v. Hartmann*, 958 F.2d 774 (7th Cir. 1992).

The first bit of evidence, then, on the issue of whether Wren was granted immunity is his cooperation agreement, in which we find the following statement:

> At this time, no promises have been made to you, nor have any agreements been reached with you by the ATF regarding what sentence you may receive for your participation in the illegal firearms purchases and sales scheme, or what charges will be filed against you by the United States.
>
> . . . You have agreed to cooperate because you have been informed that the extent and nature of your

cooperation will be made known to the judge who will sentence you, and that your cooperation will also be considered by the United States Attorney's Office in its decision as to what charges to file against you for your involvement in the illegal firearms purchases and sales scheme.

One cannot read these statements without concluding that the threat of prosecution remained. Second, we have Wren's statement to the grand jury which shows that before he testified he was advised of his right to remain silent and to consult with an attorney.

Wren nevertheless says he had a phone conversation in which the investigating agent told him no charges would be brought against him. His son and a friend filed affidavits saying they were present during this conversation. Wren also claims he did not read the cooperation agreement before signing it.

At trial, however, Special Agent Sherrow testified that Wren was never promised immunity and that Wren read, signed, and initialed the cooperation agreement and that he was alert and responsive when he did so. We cannot find that Wren was granted immunity for his statements.

On appeal, Wren raises an issue that his grand jury testimony was involuntary because he was medicated and incapable of understanding what was happening. This issue was not developed in the district court, and therefore our review is limited to a determination whether there is plain error. *United States v. Brumley*, 217 F.3d 905 (7th Cir. 2000). The transcript of the grand jury proceedings does not show that Wren was incoherent or that he did not understand the nature of his testimony. The court reporter testified that Wren seemed alert and responsive when he testified. Thus, Wren is miles away from demonstrating that he is the victim of plain error.

Wren also raises objections to three findings of the district court, which form the bases of enhancements to his sentence: (1) that the offense involved 50 firearms; (2) that he had reason to know that the firearms he supplied would be used in other criminal offenses; and (3) that he obstructed justice by committing perjury at trial.

We review the district court's factual determinations at sentencing for clear error. *United States v. Griffin*, 310 F.3d 1017 (7th Cir. 2002). A factual finding is clearly erroneous only if, after considering all the evidence, we are left with a firm conviction that a mistake has been made. *United States v. Messino*, 55 F.3d 1241 (7th Cir. 1995). A district court's choice between two permissible inferences from the evidence cannot be clearly erroneous. *United States v. Wyatt*, 102 F.3d 241 (7th Cir. 1996). We lack authority to review a refusal to depart from the guideline range unless it is clear that the judge believed he lacked the authority to depart. *United States v. Aron*, 328 F.3d 938 (7th Cir. 2003).

Under U.S.S.G. §2K2.1(b)(1), a sentence is enhanced by 6 levels if the offense involves between 25 and 99 firearms. At trial the parties stipulated to the accuracy of two government summary charts showing that Wren supplied 50 firearms to Rowe and Sangster directly or through straw purchasers. Nevertheless, Wren argues that he could only be held responsible for 21 firearms because that is the number recovered in connection with criminal activity. The argument cannot be sustained. The guideline does not require that the guns be recovered in criminal activity for the enhancement to apply.

Wren also argues that it was error to find that he knew or had reason to know that the firearms would be possessed in connection with a felony. U.S.S.G. §2K2.1(b)(5) provides for a 4-level enhancement for such a transfer. Making what sounds like an argument that he "didn't know the gun was loaded," Wren says he did not know the guns would be used

in criminal activity. The evidence at trial was sufficient to show that he did. The inference is easily drawn from the sheer number and type of firearms that he supplied. The circumstances under which he sold the guns also show that he had reason to know the sales were not on the up and up. Besides all that, his grand jury testimony was that he knew the straw purchasers were buying guns for Sangster because they never selected or inspected the guns they bought, nor did they pay for them. Also, the women were buying more guns than they reasonably could need. We cannot find clear error in the district court finding on this enhancement.

Wren says he did not commit perjury at trial and his sentence should not have been enhanced under U.S.S.G. §3C1.1. In that regard, we uphold an obstruction enhancement so long "as the district court made an independent finding of obstruction that encompasses all of perjury's factual predicates." *Griffin* at 1023-24. And we afford great deference to the sentencing judge's determination that the enhancement is appropriate. *United States v. Lanzotti*, 205 F.3d 951 (7th Cir. 2000). Wren testified at trial that he didn't know that the sale of the firearms in question was illegal until the ATF agent told him so. He also said that as soon as he received tracers from ATF he stopped selling the guns. But the investigating agent testified that Wren continued to sell firearms after he received tracers. Wren also said that an AUSA gave him a new statement to sign just 5 minutes prior to his testimony at the grand jury and told him just to sign it. He also testified that he was promised immunity. Again the investigating agent testified that only one statement was ever prepared by the AUSA, that it was signed the day before Wren testified before the grand jury, and that there was no promise of immunity.

Chief Judge Kocoras succinctly summarized the situation, saying:

> But I listened to all of this evidence, quite frankly, and aside from the clash in testimony, which is not— you could not square it up; someone was not telling it right—a lot of the things that I think Mr. Wren said, and I do not mean to be so harsh and direct about it, but I found inherently implausible.

> . . . And I cannot help but, therefore, conclude, with or without the competing testimony, that it did not happen the way he said it happened.

The judge also said he did not think that Wren was "forced to say things that he didn't willingly say and volunteer." We also cannot say that these findings are insufficient or otherwise in error.

Finally, we lack jurisdiction to review Wren's contention that he should have been granted a downward departure based on his physical condition, so long as Chief Judge Kocoras was aware that he had the discretion to depart downward. The judge, it is clear, was well aware of his discretion and in fact stated that "in appropriate cases I have done that [depart downward]."

We turn now to the issues raised by Yarbor. He claims that the indictment against him for conspiracy to transport illegally acquired firearms through interstate commerce was not returned within the 5-year statute of limitations. For that reason, he says, his motion for judgment of acquittal should have been granted.

Although we review *de novo* the question whether the statute of limitations has run, *see United States v. Anderson*, **188 F.3d 886, 888** (7th Cir. 1999), the question whether the district court properly found that there was sufficient evidence to show that a defendant committed the offense within the relevant time period is one that receives the highly deferential review reserved for evidentiary challenges to criminal convictions, *see United States v. Richardson*, **208 F.3d 626, 631** (7th Cir. 2000); *United*

*States v. Griffin*, 150 F.3d 778, 784 (7th Cir. 1998); *United States v. Barnes*, 230 F.3d 311 (7th Cir. 2000).

In order to prove a conspiracy, the prosecution must prove that the conspiracy existed and that each defendant was a member at some point in the 5 years preceding the date of the indictment. *United States v. Read*, 658 F.2d 1225 (7th Cir. 1981). The statute of limitations does not begin to run until the offense expires or from the last act in furtherance of the conspiracy. *United States v. Yashar*, 166 F.3d 873 (7th Cir. 1999). Also, the government need not prove any overt acts of a particular defendant within the limitations period but must show that the conspiracy existed into the limitations period and that the defendant did not withdraw from the conspiracy prior to that time. In fact, a defendant's membership in the conspiracy is presumed to continue unless he withdraws from the conspiracy by the affirmative act of confessing to the police or by clear communication to coconspirators that he is withdrawing. *United States v. Maloney*, 71 F.3d 645 (7th Cir. 1995). Simply ceasing to participate even for extended periods of time is not sufficient to show withdrawal. *United States v. Bafia*, 949 F.2d 1465 (7th Cir. 1991).

The indictment in this case was returned on February 13, 2002. Yarbor sees two reasons why that date is outside the statute of limitations. First, he claims that three of the four coconspirators had withdrawn from the conspiracy or were incapacitated by as early as November 1996 and at least no later than January 1997. Second, he says that evidence at trial established that he withdrew from the conspiracy as early as July 1996 but no later than October 1996.

The evidence relevant to the issue included Sangster's testimony that after Rowe was released from prison he continued to make trips to Mississippi to purchase guns. His trips continued at least until April 3, 1997, when he purchased a Bryco 9mm in the name of Paulette Hayes. A

few days before Rowe's house was searched in August 1997, he showed Sangster a shotgun he had purchased from Wren. There is evidence that the conspiracy continued until August, which would mean that the indictment was timely.

There was no real evidence of any affirmative act on Yarbor's part to withdraw from the conspiracy. Although Sangster testified that in the summer of 1996 Yarbor said he was going to stop making trips to Mississippi in order to concentrate on selling drugs, he also testified that Yarbor said he would go to Mississippi with Sangster when he had a chance to. Yarbor's statement about changing careers is not sufficient to show that he left gunrunning behind. In addition, he says that an argument he had with Sangster, which his brother Tony Yarbor overheard, shows he withdrew. But Tony Yarbor did not know what the subject of the argument was, and in any case an argument is not sufficient evidence of withdrawal. There is evidence to support a finding that the conspiracy extended into the limitations period and that Yarbor did not affirmatively withdraw from the conspiracy. His motion for judgment of acquittal on this ground was properly denied.

A related issue Yarbor raises involves the district court's refusal to instruct the jury on his theories of defense that the conspiracy terminated or that he withdrew from it more than 5 years before the indictment was returned. When there was a proper objection at trial, as there was here, we review the refusal to give a tendered theory of defense instruction *de novo. United States v. Mutoc*, 2003 WL 22746676 (7th Cir. Nov. 21, 2003).

A defendant is entitled to a theory of defense instruction if (1) he proposes a correct statement of the law; (2) his theory is supported by the evidence; (3) the theory of defense is not part of the charge; and (4) the failure to include an instruction of the defendant's theory would deny him a fair trial. *United States v. Swanquist*, 161 F.3d 1064,

1075 (7th Cir. 1998). A " 'mere scintilla' of evidence support-ing a defendant's theory . . . is not sufficient to warrant a defense instruction." *United States v. Buchmeier*, 255 F.3d 415, 427 (7th Cir. 2001). Specifically, a defendant is entitled to a withdrawal instruction only if the evidence could sustain the claim. *United States v. Nava-Salazar*, 30 F.3d 788 (7th Cir. 1994).

Our review of the record convinces us that the refusal to give the instructions was proper. The conspiracy continued until August 1997 when Rowe's house was searched by the Chicago police department. There is no evidence that Yarbor took affirmative steps to withdraw from the con-spiracy. His not taking actions in furtherance of the con-spiracy is not the same as taking affirmative action to withdraw.

Yarbor also appeals from two determinations made at his sentencing hearing. He contends that the district court erred in finding that he committed the present offense after sustaining two felony convictions for drug offenses and in finding that the firearms involved were semiautomatic assault weapons. We review a sentencing court's factual findings for clear error; questions of law are reviewed *de novo*. *United States v. Bruder*, 945 F.2d 167 (7th Cir. 1991).

Section 2K2.1(a)(1) of the United States sentencing guidelines provides for an enhancement in a defendant's base offense level if "the offense involved a firearm de-scribed in . . . 18 U.S.C. § 921(a)(30), and the defendant committed any part of the instant offense subsequent to sustaining at least two felony convictions for either a crime of violence or a controlled substance offense[.]" Yarbor claims that the government failed to prove that the weap-ons involved in the present offense were semiautomatic assault weapons as defined by 18 U.S.C. § 921(a)(30)(B).

Section 921(a)(30) provides:

The term "semiautomatic assault weapon" means—

. . .

(B) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of—

(i) a folding or telescoping stock;

(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

(iii) a bayonet mount;

(iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and

(v) a grenade launcher[.]

Yarbor claims the weapon at issue did not meet two of these characteristics—(i) and (ii). However, it was virtually undisputed that the weapon had a folding stock. The only real issue was whether the pistol grip protruded *conspicuously* beneath the action of the weapon. Yarbor says that *United States v. Spinner*, 152 F.3d 950 (D.C. Cir. 1998), and *United States v. Meadows*, 91 F.3d 851 (7th Cir. 1996), establish that, without guidance from expert witnesses, juries are not qualified to make determinations as to what statutory features exist on any particular firearm. There was no expert testimony here so, the argument goes, there can be no finding about whether the pistol grip protruded conspicuously beneath the weapon. The problem with the argument is that *Spinner* and *Meadows* are distinguishable. In both cases, the issue was one for trial where, of course, the burden on the government is to prove the nature of the gun beyond a reasonable doubt. Here, it was not necessary to prove beyond a reasonable doubt that the gun was semiautomatic. The issue came up at sentencing where the burden of proof is a preponderance of the evidence. *Harris v. United States*, 536 U.S. 545 (2002); *United States v.*

*Merritt*, 2004 WL 549475 (7th Cir. Mar. 22, 2004). Furthermore, the issue does not seem to require any particular expertise. The discussion about this feature of the gun at sentencing shows that Chief Judge Kocoras found the argument that the pistol grip did not protrude conspicuously to be almost frivolous. In making his factual finding he had an opportunity to see the gun and found that the pistol grip extended conspicuously. Looking at the gun, the judge stated in no uncertain terms that it was conspicuous. We have no basis in the record before us to say that the finding is clearly erroneous.

Yarbor also argues that even if the gun is a semiautomatic assault rifle pursuant to 18 U.S.C. § 921(a)(30)(B), it is excluded under 18 U.S.C. § 922(v)(3)(B)(ii) in that it "has been rendered permanently inoperable" or under subsection (C) in that it "cannot accept a detachable magazine that holds more than 5 rounds of ammunition[.]" On the first exception, Chief Judge Kocoras said there was a presumption that the gun was operable and no one had shown him that it wasn't. On the second exception, Special Agent Sherrow testified, "The magazine that came with the weapon did have a capacity to carry more than five rounds." The finding that the exceptions did not apply is not clearly erroneous.

As to the requirement that Yarbor have been convicted of two prior felony drug charges, we note that he was convicted of such charges on April 18, 1997. That means that the guideline would apply to the present case if the conspiracy continued past that date. The issue, then, involves the same facts we have been discussing. How long did this conspiracy continue? We have said that there was evidence from which to conclude that it continued until August 1997 when Rowe's house was searched. It therefore was not error for Chief Judge Kocoras to find by a preponderance of the evidence that Yarbor had two prior felony drug convictions. Similarly, relying on our previous discussion, we find that

it was not error for the judge to find that Yarbor did not withdraw from the conspiracy prior to the drug convictions. Accordingly, the application of U.S.S.G. §2K2.1 to Yarbor's sentence was not error.

   The judgments of conviction and the sentences of Jimmy Doyle Wren and Charles Yarbor are AFFIRMED.


A true Copy:

       Teste:


                    _____
                    *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*