# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-3904

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

LLWELLYN GREENE-THAPEDI,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 9129—**Wayne R. Andersen**, *Judge.*

———————

ARGUED APRIL 12, 2004—DECIDED FEBRUARY 17, 2005

———————

Before WOOD, EVANS, and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* For three years running, Llwellyn Greene-Thapedi failed to file her income tax returns in time. After processing her multiple late returns, the Internal Revenue Service (IRS) issued her a refund check in the amount of $17,028. Later, it discovered that she was not entitled to this check after all. After unsuccessful attempts to recover the funds from Greene-Thapedi, the government brought this lawsuit. The district court held that the government filed its claim within the allowable time and that it was entitled to recoup most of the refund it had issued to Greene-Thapedi. We affirm.

**I**

In May 1999, Greene-Thapedi filed her tax returns for the years 1996 and 1997. Two months later, she filed her 1998 return. The IRS was in the process of determining Greene-Thapedi's 1996 tax liability when it received the three returns. Instead of processing the three returns in chronological order, the agency first processed the 1997 and 1998 returns, using its computerized system. Because it had already started manual processing of the 1996 return, internal procedures required the agency to complete the 1996 return manually. This meant that the 1996 return took longer to complete than the computer-processed 1997 and 1998 returns. The confusion in this case arises because the returns were not processed in chronological order.

Through a series of transactions which we describe below, the IRS mistakenly credited Greene-Thapedi with two refunds, each in the amount of $11,535, when she was entitled to only one such refund. The 1997 return was the first to be processed completely. It showed that Greene-Thapedi owed approximately $30,000 in taxes. In addition to this tax liability, the IRS assessed three penalties in connection with the 1997 return: one for late filing, 26 U.S.C. § 6651(a)(1); one for failure to pay, 26 U.S.C. § 6651(a)(2); and one for failure to make estimated payments, 26 U.S.C. § 6654. The penalties were based on the amount by which her taxes were underpaid and the length of time the underpayment persisted. Initially, these three penalties totaled $10,293.

The 1998 return was the second to be processed. It showed an overpayment of tax in the amount of $12,973. This amount was automatically applied against Greene-Thapedi's 1997 tax liability, consistently with IRS procedure. In addition, the 1998 overpayment prompted the IRS to abate some of the 1997 penalties. After the 1998 return was fully processed, much, but not all, of Greene-

Thapedi's 1997 liabilities had been eliminated. When the manual processing of Green-Thapedi's 1996 return was complete, the IRS discovered that she had also overpaid her 1996 tax by $11,535 and that some of this overpayment could be applied to what was left of her 1997 liabilities. This discovery resulted in yet another reduction in her 1997 penalties. After applying $9,206 of the $11,535 overpayment to her 1997 liabilities and penalties, the IRS issued Greene-Thapedi a check for $2,645, which included $316 in interest owed by the IRS. The IRS then realized that Greene-Thapedi was owed a second refund check of $753 because of further adjustments to her 1997 penalties. Once the IRS issued these two refund checks, Greene-Thapedi's account was settled. The IRS should have stopped there.

Instead, the agency mistakenly credited Greene-Thapedi with a *second* refund in the amount of $11,535. Somewhat red-faced, the government explains that this occurred because of the delay between processing the 1997 return by computer and processing the 1996 return by hand. The IRS employee who manually entered Greene-Thapedi's 1996 information added a second credit of $11,535 to her 1997 return even though this amount had already been accounted for in the two refunds we discussed above. When all was said and done, the defendant received yet a third refund from the IRS in the amount of $17,028. (We note that this amount differed from the original $11,535 refund because the interest amount and other assessments changed every time Greene-Thapedi's tax liability was adjusted.)

Greene-Thapedi received the $17,028 refund on November 27, 1999. Interestingly, however, she did not cash it right away. Instead, she spoke with two different IRS customer service representatives, each of whom told her that the refund amount was correct. After Greene-Thapedi asked for a written confirmation from the IRS, the agency sent her a copy of her 1997 tax account showing a zero balance and an

issued check in the amount of $17,028. After receiving this confirmation, Greene-Thapedi cashed the check. Records from the Treasury Department show that payment on the check occurred on December 21, 1999. Sometime thereafter, the government discovered that the $17,028 refund check had been issued in error. After unsuccessfully attempting to recover the funds from Greene-Thapedi, the government filed a complaint in federal court on November 28, 2001, two years and one day after Greene-Thapedi received the check, but one year and 342 days after the payment was completed.

The statute governing suits to recover erroneous tax refunds provides that, absent fraud or misrepresentation, an action must be brought within two years of "the making of the refund." 26 U.S.C. § 6532(b). In the district court, Greene-Thapedi argued that her refund was "made" on November 27, 1999, the date she received the check in the mail. Relying on that date, she argued that the government's suit was time-barred by the statute of limitations because it was filed on November 28, 2001, one day after the two-year limitations period had run. The government countered that the "making of [a] refund" occurs when the Treasury authorizes the refund payment and the check clears the relevant Federal Reserve Bank. If that is the proper rule, then this case was filed in time, because the payment was authorized on December 21, 1999. The district court agreed with the government, holding that the statute of limitations ran from the "date payment could no longer be stopped, namely, the date on which the check clears the Federal Reserve Bank." This was a readily ascertainable date, in the view of the district court, and a more certain reference point than the date the taxpayer received the check in the mail. After concluding that the government's suit was timely, the district court also found that the refund issued to Greene-Thapedi was indeed erroneously issued. It entered judgment for $15,784.48 plus interest in favor of the United States and this appeal followed.

## II

When the United States issues a taxpayer an erroneous refund check, the government may bring a civil action to recover the refund. 26 U.S.C. § 7405(b). Absent allegations of fraud or misrepresentation on the part of the taxpayer (and there is no hint of either one here), the government must initiate such a suit within two years after the refund was "made." 26 U.S.C. § 6532(b) ("Recovery of an erroneous refund by suit . . . shall be allowed only if such suit is begun within 2 years after the making of such refund . . . ."). We must decide, as a matter of first impression in this circuit, what act triggers the two-year statute of limitations in a suit brought by the government pursuant to Section 6532(b). This is a determination that we make *de novo. United States v. Pearson*, 340 F.3d 459, 464 (7th Cir. 2003); see also *United States v. Domino Sugar Corp.*, 349 F.3d 84, 86 (2d Cir. 2003) (establishing a *de novo* review of limitations in erroneous refund action).

The parties have offered two competing dates for our consideration: the date the taxpayer receives the check in the mail, and the date the Treasury honors the check. Other logical possibilities include the date when the check was prepared, which appears on the face of the check, or the date when the IRS mailed the check. Our analysis must be guided by the proposition that statutes of limitations, when applied against the government, are to receive a strict construction in favor of the government. *Badaracco v. Comm'r of Internal Revenue*, 464 U.S. 386, 391-92 (1984); *E.I. Du Pont De Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924); *Domino Sugar Corp.*, 349 F.3d at 88.

Although the Supreme Court has not addressed the precise question posed in this appeal, Greene-Thapedi points to dicta in *O'Gilvie v. United States*, 519 U.S. 79 (1996), to support her argument that the date of receipt governs. In *O'Gilvie*, the Court determined that as be-

tween the date the check was mailed by the IRS or the date that the check was received by the taxpayer, the limitations period under 26 U.S.C. § 6532(b) commenced on the date the check was received by the taxpayer. 519 U.S. at 91. At a minimum, *O'Gilvie* thus rules out any *earlier* date than the date when the check was received by the taxpayer. The Court did not consider, however, whether the date of the taxpayer's receipt was the *latest* possible time for the statute to begin running. Nonetheless, two aspects of the Court's reasoning are instructive. First, the Court emphasized the importance of construing limitations in favor of the government. In fact, the Court rejected the date of mailing in favor of the date of receipt because under the facts of that case, use of the mailing date would have barred the action and thus would have disadvantaged the government. *Id.* The Court also observed that use of the "date of receipt" rule had not "proved difficult to administer in ordinary state or common-law actions for money paid erroneously. The date the check clears, after all, sets an outer bound." *Id.* at 92. See also *id.* at 101 (stating that the Court's resolution did "not demand that [the statute of limitations] issue be addressed, except to the extent of rejecting the proposition that the statutory period begins to run with the mailing of a refund check. So long as that is not the trigger, there is no need to decide whether the proper trigger is receipt of the check or some later event, such as the check's clearance.") (Scalia, J., dissenting).

Much earlier, the Supreme Court held that the forerunner of § 6532(b) ran from the "date of payment" rather than the date on which the IRS Commissioner approved the refund. *United States v. Wurts*, 303 U.S. 414, 418 (1924). Although the Court did not define the "date of payment" as it bears on this case, it again selected the date that favored the government. *Id.* at 416. The Court also stated that the taxpayer does not have a right to the refund prior to the date of payment because the IRS could at any time before

then "cancel the payment and revoke the authority of payment erroneously made." *Id.* at 418.

The government's authority to cancel payment on a check prior to final authorization by the Treasury Department was clear in 1924, and it remains clear today. See 31 U.S.C. § 3328(f) ("Nothing in this section limits the authority of the Secretary to decline payment of a Treasury check after first examination thereof at the Treasury."); 31 C.F.R. § 240.6(b) ("Treasury shall have the right as a drawee to complete first examination of checks presented for payment, to reconcile checks, and, when appropriate, to make a declination on any check."). As these provisions suggest, the Treasury is authorized to decline payment on a check even after a taxpayer has received it in the mail. See *Wurts*, 303 U.S. at 417-18 (stating that the IRS Commissioner "might—even after a check was signed and mailed—cancel the payment. . . ."). This implies that the government should not even think about this kind of suit before the taxpayer cashes the refund check. *Id.* at 418 ("Obviously, the Government had no right to sue this taxpayer to recover money before money had been paid to him.").

Only one court of appeals has addressed the precise question before us. It concluded that the "making of such refund" occurs on the date when "the check cleared the Federal Reserve and payment to the taxpayer was authorized by the Treasury." *United States v. Commonwealth Energy Sys. and Subsidiary Cos.*, 235 F.3d 11, 14 (1st Cir. 2000). In *Commonwealth Energy*, the IRS issued a sizable refund check, which was received by the taxpayer on July 27, 1995. The government filed suit on July 30, 1997, two years and three days later, claiming that the refund was issued in error. *Id.* at 13. In deciding how to measure the limitations period, the First Circuit concluded that a check-clearing rule was superior to a date-of-receipt rule both because it construed the limitations period in favor of the government and because it provided a clear reference point

for all concerned. *Id.* at 14-15. ("Although the Treasury cannot know for certain when a check is received by a taxpayer, it can know when that check clears, and determine whether or when to file suit accordingly."). Noting that Treasury records reflected authorization of payment to the taxpayer on August 2, 1995, the court held that the government's suit was not barred by the two-year limitations period when it was filed on July 20, 1997. *Id.*

Greene-Thapedi counters that there are two other appellate decisions that apparently adopt a date-of-receipt rule. In our view, however, those cases do not support her position. *Paulson v. United States*, 78 F.2d 97 (10th Cir. 1935), is of little or no help to her. In the same vein as the Supreme Court's decision in *Wurts*, *Paulson* held that the two-year limitations period did not commence with the date on which the IRS Commissioner issued a refund but instead "when the money is paid." 78 F.2d at 99. The court did not clarify what it meant by "when the money is paid," but that phrase seems to us to be consistent with the First Circuit's position. Indeed, the Tenth Circuit commented on the fact that the IRS could cancel payment on a refund check at any point prior to payment. *Id.* ("Ordinarily a statute of limitation does not begin to run until a suit could be brought. Certainly it cannot be contended that a suit of this nature may be maintained and judgment secured after the schedule of refunds and credits has been approved, but before the money is paid to the taxpayer."). *United States v. Carter*, 906 F.2d 1375 (9th Cir. 1990), is just another case in which the court was presented with a choice between the date of mailing and the date of receipt. As the Supreme Court later did in *O'Gilvie*, the Ninth Circuit chose the date of receipt. *Id.* at 1377-78. It said nothing about the date of negotiation, as there was no need to do so.

We conclude that the First Circuit's approach in *Commonwealth* is sound, for the reasons given by that court. Factual disputes are more likely to arise when a court is asked to

determine the date that a taxpayer received a refund check in the mail. By contrast, a court can determine with near certainty the date on which the Treasury authorized payment on the check. This rule permits both the government and the taxpayer to know exactly when the limitations period commences. As applied to these facts, the two-year statute of limitations began to run on December 19, 1999, when the Treasury department records show that Greene-Thapedi received payment on the refund check. The government's suit, which was filed on November 28, 1999, was thus not time-barred.

## III

After a two-day bench trial, the district court concluded that Greene-Thapedi had received an erroneous refund check in the amount of $17,028. The government conceded, however, that it was seeking only $15,784.48, for reasons that it did not make clear to the district court. Accepting the lower number, the court entered judgment for the government in the amount of $15,784.48, plus interest. We review its findings under the clear error standard of Federal Rule of Civil Procedure 52(a). *Piraino v. Int'l Orientation Res., Inc.*, 137 F.3d 987, 990 (7th Cir. 1998).

Greene-Thapedi asserts that the district court erred when it imposed the burden of proof on her as the taxpayer. But the court's opinion explicitly stated that the government had the task of "proving that the refund was erroneous." Greene-Thapedi also claims that the government made "judicial admissions" about the correctness of the refund. We are not quite sure what to make of this argument, or its relevance to the district court's factual findings, because an erroneous refund suit necessarily implies that the government initially made a mistake in issuing the refund.

Finally, Greene-Thapedi now argues that the government's decision to seek less money than the face value of the refund check, shows somehow that the court clearly erred in finding that any amount at all was due. We disagree. The trial testimony and documentary evidence amply demonstrated that the IRS issued Greene-Thapedi two separate refunds for $11,535, when she was entitled to only one such refund. We conclude that the record supports the district court's finding that Greene-Thapedi received an erroneous refund and AFFIRM the judgment.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*