In the

# United States Court of Appeals
## For the Seventh Circuit

No. 04-1574

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TIMOTHY J. JULIAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:02CR61—**Rudy Lozano**, *Judge.*

ARGUED MAY 4, 2005—DECIDED OCTOBER 24, 2005

Before RIPPLE, ROVNER, and WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* A jury convicted defendant-appellant Timothy Julian of conspiring to travel in foreign commerce with the intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b) and (e), and of aiding and abetting the transportation of an individual in foreign commerce with the intent that the individual engage in prostitution, in violation of 18 U.S.C. §§ 2 and 2421. The district court sentenced him to a prison term of 300 months, the statutory maximum term. We affirm Julian's convictions and sentence.

## I.

As this case comes to us following Julian's conviction by a jury, we are obliged to view the trial evidence in a light favorable to the government. *E.g.*, *United States v. Carraway*, 108 F.3d 745, 750 (7th Cir. 1997) (per curiam).

In November of 1997, Timothy Julian made the acquaintance of Robert Decker while vacationing in Acapulco, Mexico. Decker lived in Acapulco but, like Julian, hailed from the United States. Decker also shared in common with Julian a sexual interest in young boys; both men, in fact, previously had been convicted of child molestation. Julian and Decker decided to embark on an entrepreneurial venture in so-called "sex tourism" in Acapulco by creating a guest house and safe haven for pedophiles, who were sometimes referred to by the witnesses in this case as "boy lovers," meaning men who liked to engage in sexual acts with male children. Julian, who was unhappy with his work and life in the United States, hoped eventually to move to Acapulco and manage the hotel full-time. Pending Julian's relocation, the men agreed that Decker, who could read and speak Spanish, would manage the hotel, while Julian would take responsibility for funding the operations of the hotel, advertising, and booking its guests.

To get the business off the ground, the men found a mansion to rent on Privada de La Marina in Acapulco which they named Castille Vista del Mar (hereinafter, "CVM"). CVM had six bedrooms, a gymnasium, a pool, and (as its name suggests) a view of the ocean. At one time, it was part of the estate owned by William Boyd, the American actor who brought to life novelist Clarence Mulford's cowboy hero Hopalong Cassidy on the silver screen in the 1930s and 40s. Julian helped to choose the property and negotiate the terms of the lease but had to return to the States before the lease was ready to sign, so Decker signed the lease agreement for both of them. Decker signed the lease as Roberto

Compos Lopez, a pseudonym; and Decker made a notation next to Julian's name indicating that he was also signing the lease for Julian with Julian's power of attorney. The lease identified both Decker (as Compos) and Julian as tenants of the property; and it was to run for a period of one year: January 28, 1998 to January 28, 1999. Julian paid the deposit of approximately $3,600 on the property; he also gave Decker an ATM card for an account he held at LaSalle Bank in Illinois to enable Decker to make rental payments on the property and to fund the day-to-day expenses of the resort.

To round up customers for the hotel, Julian created a website (to which he had the sole access code), designed internet advertisements, and engaged in personal solicitation. One of the advertisements featured a 12 year-old boy along with an announcement that "escorts" were provided for guests of the resort. Decker testified that in paying for their visits to the resort, guests would initially make a deposit to Julian's bank account in the United States and pay the remainder either before or upon their arrival in Mexico.

To "staff" the hotel, Decker and Julian recruited boys from the beaches and town square of Acapulco. The boys ranged in age from seven to 18 years old and were from throughout Mexico. Decker testified that it was "[e]xtremely easy" to recruit these boys. Feb. 10, 2003 Tr. (Decker excerpt) at 26. Some had run away from troubled homes, while others were altogether homeless. They were lured to CVM with promises of shelter, food, and other benefits. Soon after arriving at the hotel, however, the boys learned that they were expected to have sex with the hotel's guests as a condition of staying there. For the most part, the boys complied, often because they had no other choice. As one of the boys explained, "Two or three things were done by force; two or three things were maybe done in order to get the things they [Julian and Decker] had promised. A lot of them

did it because they wanted to get some money to help their parents." Feb. 11, 2003 Tr. (Calderon/Cesena excerpt) at 44.

The companionship and sexual services of the boys were included in the rate Decker and Julian charged their guests. On arrival at CVM, a guest would be offered his pick of the four or five boys who were living at the hotel; if a guest was not satisfied with the selection, he might be taken to the gay beach in Acapulco to pick up another boy. Although the guests were not required to pay the boys, they sometimes gave the boys shoes, clothing, and other gifts. Decker urged the boys to swim naked in the pool when a guest was present to drum up business for themselves. One of the boys would later testify that, according to Decker, "the more naked we were, the better for us, because we would be able to get more things." Feb. 11, 2003 Tr. (Calderon/Cesena excerpt) at 42.

David Calderon was one of the boys who was recruited to live at CVM. Calderon testified that he was 16 or 17 years old when he lived at the hotel.[1] Decker and Julian had told Calderon that CVM was a shelter for homeless children like himself and that they would help him. Among the responsibilities assigned to Calderon was the task of cleaning the guest rooms; and on one occasion, Julian also gave him 12,000 pesos with which to pay the monthly rent on the property to the landlord. However, Calderon quickly learned that boys staying at the resort also were expected to sexually service the guests.[2] Cal

---

[1]  Although there is some allusion in the record to the possibility that Calderon may have celebrated his 18th birthday while staying at CVM, Calderon indicated that he was born on June 7, 1981 and that he was 16 rather than 18 years old while residing at CVM.

[2]  Calderon testified that, in addition to the boys who stayed at
(continued...)

deron himself acknowledged having engaged in sex with Julian.

Roberto Ezekiel Guzman Cesena stayed at CVM for a period of five months. Cesena was born in 1985 and was 13 years old when he lived at the hotel. Cesena had been left without a home and means of support after his uncle, with whom he had been living, took a job in Mexico City. Cesena had met Decker on a beach in Acapulco and had traded sex with him for food, housing, and money. Cesena and a friend had been living with Decker for nine months when Julian and Decker started the hotel, and he moved to CVM on the promise of a job.[3] Cesena recalled that he had met Julian for the first time when Decker took him to an Acapulco apartment or hotel (not CVM) where Julian was staying; on that occasion, Julian attempted to penetrate Cesena with his penis. Julian later told Cesena that if he did not wish to engage in this type of activity, he was always free to leave CVM. Penniless and with few options, Cesena remained at the hotel, where he was subsequently grabbed and forcibly raped by Julian and Decker. Cesena stuck it out for another two weeks after that attack, hoping that Julian and Decker would honor their promise to buy him a bus ticket to Tijuana, where his

----

[2] (...continued)
the hotel (who ranged in age from seven or eight years old to 16 or 17), there were other boys who visited the hotel while American guests were present. Calderon said that he knew of only one such visiting boy who would "sleep with" Americans. Feb. 11, 2003 Tr. (Calderon/Cesena excerpt) at 9. The record is not clear as to whether by "sleep with" Calderon meant to have sex with a guest or rather to spend the entire night with a guest, *see id.*; Calderon did not speak English and testified through an interpreter.

[3] Although Decker in his own testimony was not certain that Cesena had ever stayed at CVM, Cesena had no doubt that he had.

parents lived. When the ticket was not forthcoming, Cesena finally decided he had had enough. He left CVM, taking a television set with him.

Although Decker was responsible for the day-to-day management of CVM, Julian returned to Acapulco on several occasions to "host" the clients he had recruited to stay at the hotel. According to Decker, Julian was at CVM on a total of three or four occasions and while there also made use of the sexual services of some of the young boys.[4]

The advertising that Julian had prepared for CVM attracted client Richard Coon, who had been searching the World Wide Web for sex tourism sites and was first alerted to the nature of CVM by an ad's use of the term "young guys" and by Julian's use of the phrase "young smooth boys" in subsequent e-mail correspondence with Coon. Feb. 12, 2003 Tr. (vol. 3) at 30-31. After informing Julian of his preference for boys in the range of 14 to 16 years old, Coon booked a stay at CVM for October 14 through October 22 of 1998. Coon's all-inclusive package, arranged through Julian, included a room, breakfasts, and an escort for seven days at a total cost of $700.[5] Julian returned to Acapulco to host Coon's visit to the hotel on October 14, 1998. Julian met Coon at the airport, and he was later present when Coon picked an escort for the week from a group of four boys. Although the boys presented to Coon were 14 to 17 years old, Coon saw a boy he believed to be as young as eight years old on the CVM premises. Coon believed his chosen escort Armando, with

---

[4] On September 11, 1998, when returning to the United States from one of his visits to Acapulco, Julian attached a business card to his Customs form indicating his affiliation with the hotel.

[5] Decker testified that the rate for a stay at the hotel sometimes included food but always included the cost of an escort.

whom he engaged in mutual masturbation and oral copulation, was between the ages of 16 and 17.

Later in October, during the week of Halloween, Louis Accordini, a longtime friend of Julian's, also came to the resort to bring Julian some of his belongings. Julian at this point was preparing to live in Acapulco full time. At Julian's urging, Accordini had considered investing in CVM, understanding that Julian was eventually going to run the place; but Accordini had opted instead to assist Julian by depositing checks for the hotel into Julian's bank account and ensuring that there were funds in Julian's accounts that could be accessed at ATMs in Mexico. When Julian first mentioned CVM to Accordini, he described it as a gay resort. Later, Julian told him that it was a haven for men who were sexually interested in boys, as both Julian and Accordini were. Accordini understood that "the boy-lovers could go down there and have their choice of males they wanted." Feb. 12, 2003 Tr. (vol. 3) at 55.

Accordini had visited CVM on two occasions prior to October 1998 and had sex with a boy named Edgar, whom he believed was 15 to 17 years old, and another named Armando, whom he believed was 17 or 18 at the time. Accordini became infatuated with Armando, and when Armando told him that he wanted to come to the United States, Accordini consulted with Julian. Julian suggested that he (Julian) could give Armando a ride to (or near) the border crossing, where Armando would meet up with a "coyote" (i.e., smuggler) to take him across into the United States. Accordini subsequently sent Julian a check for $300 to $400, assuming that Julian would use some of the proceeds to pay for gas and other expenses and that the rest would be given to Armando. Events proceeded as planned, and Armando successfully crossed the border in or around May 1999. Following the crossing, Armando telephoned Accordini from Mesa, Arizona, and instructed him

to send him $1,300 so that he could pay his debt to the coyote. When Accordini and Armando had difficulty dealing with the logistics of a wire transfer of cash, Julian suggested that they contact Michael Smith, a CVM client and friend of Julian's who spoke Spanish, for his help. Julian had introduced Smith to Accordini in or around January 1999, and Smith was familiar with the plan to get Armando into the United States. With Smith's help, the wire transfer was completed, the coyote was paid, and Armando made his way to Smith's home in Denver, where Smith put him on a bus to the Midwest. Armando joined Accordini in Indiana. Officials would discover him living there in September 1999, when they stopped by Accordini's home to question him about Julian. Although Accordini would later testify that he had no intentions of prostituting Armando, he conceded that it was his intent to provide Armando with shelter, food, clothing, and spending money in exchange for sex.

CVM never proved to be the financially successful operation that Decker and Julian had hoped it would be. By Decker's estimate, a total of only eight guests stayed at the hotel over the life of the venture. The premises were in need of repair, at times the hotel pool was empty of water, and electrical power to the building was intermittent; and Decker himself proved to be an inept manager. Decker had expected that Julian would pay him a salary for managing the property, but Julian had other intentions. Decker took to making several bookings of his own at the hotel, the proceeds of which he kept to himself.

Eventually, Julian and Decker parted ways. According to Decker, in late October or November 1998, when Julian was relocating to Acapulco, he sensed a coolness on Julian's part. Decker did not realize until later on that this rift would become permanent. Julian soon moved to another residence in Acapulco, however, and ceased his financial support of CVM. Smith noted that when he met Julian in or

around January 1999, Julian was no longer staying at CVM. Daniel Owczarzak, a former co-worker of Julian's, had been persuaded by Julian in the summer of 1998 to make a deposit for a week-long stay at the hotel in February 1999.[6] In October or November of 1998, Owczarzak received a phone call from Julian informing Owczarzak that "he was no longer associated with the resort" and offering Owczarzak the opportunity to apply his deposit to another private residence in Mexico. Feb. 12, 2003 Tr. (vol. 3) at 15. However, so far as the record reveals, Julian did not tell Owczarzak that CVM was no longer in business or that Owczarzak would have to cancel his trip there. Owczarzak declined Julian's offer and never did make the trip to CVM; he lost his deposit as a result.

CVM remained in business following Julian's departure and Decker hosted one or more customers whose stays Julian had booked previously. Even after he stopped visiting the hotel and communicating with Decker, Julian's name remained on the lease of the property and Julian did nothing to extricate himself from that agreement or report Decker to the authorities; nor did he ask Decker to return his ATM card, close down CVM, or leave the property. He did, however, cease making financial contributions to the business, leaving Decker stuck with responsibility for the final monthly rental payments.

Authorities, who had begun investigating Julian in

---

[6] Although Julian showed Owczarzak a brochure for CVM, he did not enlighten Owczarzak, who was neither gay nor a pedophile, as to the true nature of the hotel. Julian asked Owczarzak whether he might be interested in some female companionship during his stay. When Owczarzak allowed that he might be interested in meeting a woman in her twenties or thirties, Julian replied that he could arrange for him to meet females "a lot younger" than that. Feb. 12, 2003 Tr. (vol. 3) at 13.

1997 or 1998 for possible involvement with child pornography, eventually learned of his involvement with CVM. On August 22, 2002, a grand jury returned an indictment charging Julian with two offenses. Count One of the indictment charged that Julian had conspired with others to travel in foreign commerce for the purpose of engaging in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b) and (e). The illicit sexual conduct alleged in this case was sexual activity with a person or persons under the age of 18 under circumstances that would constitute an offense under Chapter 109A of the U.S. Criminal Code if the activity had taken place within the special maritime and territorial jurisdiction of the United States. *See* 18 U.S.C. §§ 2423(f)(1) (defining "illicit conduct"); 2246(2) (defining "sexual act"). Knowingly engaging in a sexual act with a person under the age of 18 amounts to a crime within the maritime or territorial jurisdiction of the United States when the juvenile is incapable of appraising the nature of the act, *see* 18 U.S.C. § 2242(2)(A), or when the juvenile is 12 to 15 years old and at least four years younger than the person engaging in sex with him, *see* 18 U.S.C. § 2243(a). Count Two of the indictment charged Julian with aiding and abetting the transportation of a Mexican national into the United States with the intent that the individual engage in prostitution, in violation of 18 U.S.C. §§ 2 and 2421. A petit jury convicted Julian on both charges at the conclusion of a trial in February 2003.

The district court sentenced Julian pursuant to the U.S. Sentencing Guidelines in March 2004. At sentencing, the court determined that Julian was subject to an increased statutory maximum prison term of 15 years for conspiracy that had taken effect on October 30, 1998. The court reasoned that the new statutory maximum applied because the conspiracy in this case had continued beyond October 30 and Julian, as one of the conspirators, was liable for any conspiratorial acts that took place after that date.

The court also made a number of factual determinations that had the effect of increasing the sentencing range called for by the Guidelines. These included findings that Julian's offense involved the use of threat or force, *see* U.S.S.G. § 2A3.1(b)(1) (Nov. 2003), that the crime involved victims under the age of 12, *see* § 2A31.1(b)(2)(A), and that it also involved victims who were otherwise vulnerable because they were homeless and destitute, *see* § 3A1.1(b)(1). The court's sentencing findings resulted in a total offense level of 41, which coupled with Julian's criminal history called for a sentence in the range of 324 to 405 months. However, the maximum penalties provided for by statute totaled 300 months—15 years on Count One and 10 years on Count Two. In sentencing Julian to that maximum term, the court observed that the case called for "a very significant sentence" because it dealt with children, whom the court described as "probably the most important asset we have in this country". March 2, 2004 Sent. Tr. at 149-50. The court added that the sentence must be one that would, among other things, deter similar crimes, allow the defendant a sufficient period of rehabilitation, and fulfill the court's duty to protect society, and reflect Julian's lack of remorse or regret. In the court's view, a sentence at the statutory maximum fulfilled these purposes.

**II.**

**A.**

As we have noted, Count One of the indictment charged Julian with conspiring to travel in foreign commerce with the intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b) and (e). Pursuant to section 103(2) of the Protection of Children from Sexual Predators Act of 1998, which took effect on October 30 of that year, Congress amended section 2423 to increase the maximum penalty for violating the statute from 10 to 15 years. P.L. No. 105-314, 112 Stat. 2974. The indictment in this case alleged that the conspiracy began on or about January 28, 1998 and continued until February 1999. R. 1 at 1. Therefore, the conspiracy allegedly began before the enhanced penalty took effect; and only if the conspiracy continued beyond the effective date, as the indictment alleged, could Julian be subject to the enhanced penalty. *See United States v. Torres*, 901 F.2d 205, 226-27 (2d Cir. 1990).

However, the import of the effective date of the increased statutory maximum evidently was not something that the parties or the court recognized until after the trial concluded in this case. Omitted from the jury instructions was any mention of that date. Instruction number 18 advised the jury of the elements it must find in order to convict Julian of a section 2243(b) conspiracy, but that instruction did not apprise the jury that it was under any obligation to consider whether the alleged conspiracy extended beyond October 30, 1998. R. 74, Instr. No. 18. Instruction number 35 did reference the dates specified in the indictment as marking the beginning and the end of the charged conspiracy. That instruction advised the jury that "[t]he government must prove that the offense happened reasonably close to those dates but is not required to prove that the alleged offense happened on those exact dates." R. 74, Instr. No. 35. But the jury was nowhere told that it

must find beyond a reasonable doubt that the conspiracy extended beyond the effective date of the amended version of the statute.

At sentencing, Julian objected to use of the amended version of the statute with its enhanced maximum penalty. Julian argued that he had fallen out with Decker and withdrawn from the conspiracy before October 30, 1998 and that, because he was no longer a participant when the enhanced penalty took effect, he could not be subject to that penalty. The district court overruled Julian's objection, finding that the conspiracy remained alive beyond October 30, 1998, and that Julian had not committed the type of affirmative act that would constitute a withdrawal from the conspiracy and exonerate him from liability for acts subsequently committed by his co-conspirators. March 2, 2004 Sent. Tr. at 117-19.

Although Julian contends that the district court's findings were erroneous as a matter of fact—a contention we reject for the reasons we discuss *infra* at 16-17—his principal objection to those findings on appeal sounds in the Constitution. In view of the significance of the end date of the conspiracy and Julian's participation in it, Julian argues that it was for the jury to determine whether or not the conspiracy continued beyond October 30, 1998, and whether Julian had withdrawn from the conspiracy before that date. As it was the sentencing judge rather than the jury that made these determinations, Julian argues that he was deprived of his Sixth Amendment right to a jury finding as to all essential elements of the conspiracy charge. *See generally Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63 (2000) ("any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proven beyond a reasonable doubt"). This constitutional argument was not one that Julian made below, so our review is solely one for plain error. *See, e.g., United States v. Martinez*, 289 F.3d

1023, 1027 (7th Cir. 2002); Fed. R. Crim. P. 52(b).

In order to establish plain error entitling him to relief, an appellant must establish each of four elements: (1) that an error occurred, (2) that the error was plain, (3) that the error affected his substantial rights, and (4) that the error is one seriously affecting the fairness, integrity or public reputation of judicial proceedings, such that the court should exercise its discretion to correct the error. *Johnson v. United States*, 520 U.S. 461, 466-67, 117 S. Ct. 1544, 1548-49 (1997); *United States v. Olano*, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776 (1993); *see also*, *e.g.*, *United States v. Nance*, 236 F.3d 820, 825-26 (7th Cir. 2000). Julian can meet the first three of these elements, but not the fourth.

We agree with Julian that because the alleged conspiracy spanned two different versions of the statute with different maximum penalties, the question of whether the conspiracy extended beyond the effective date of the amended version was one that had to be resolved by the jury rather than the judge. Both the old and new versions of the statute proscribed the same offense, but the newer version increased the maximum penalty to which a violator is exposed. The increase in the penalty, which took effect after the conspiracy in this case was underway, therefore implicated Julian's ex post facto rights. Article I, section 9, clause 3 of the Constitution prohibits Congress from enacting any ex post facto law. Although the classic example of an ex post facto law is one that criminalizes conduct after it has already occurred, *see Collins v. Youngblood*, 497 U.S. 37, 42, 110 S. Ct. 2715, 2719 (1990) (quoting *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798) (opinion of Chase, J.)), it also includes a law that "'changes the punishment, and inflicts a greater punishment, than the law annexed to the crime when committed,'" *Miller v. Florida*, 482 U.S. 423, 429, 107 S. Ct. 2446, 2450 (1987) (quoting *Calder*, 3 U.S. (3 Dall.) at 390 (opinion of Chase, J.)). Thus, if a defendant completes a crime before an increased penalty takes effect, it would

violate his right not to be subject to ex post facto legislation to impose the increased penalty upon him. *E.g.*, *Torres*, 901 F.2d at 226-27. If, on the other hand, the defendant was engaged in a continuing crime, such as a conspiracy, that did not conclude until after the new penalty took effect, it would not amount to an ex post facto violation to subject him to the higher penalty. *Id.* For "[i]t is well established that a statute increasing a penalty with respect to a criminal conspiracy which commenced prior to, but was continued beyond the effective date of the statute, is not *ex post facto* as to that crime." *United States v. Campanale*, 518 F.2d 352, 365 (9th Cir. 1975) (per curiam); *accord United States v. Canino*, 949 F.2d 928, 951-52 (7th Cir. 1991). As it is the lifespan of the conspiracy that determines whether, consistent with the Ex Post Facto Clause, the defendant may be subject to the enhanced penalty, the question whether the alleged conspiracy continued beyond the effective date of the new penalty is one that must be submitted to the jury. *E.g.*, *United States v. Kramer*, 955 F.2d 479, 484-86 (7th Cir. 1992); *Torres*, 901 F.2d at 227; *see also Apprendi*, 530 U.S. at 490, 120 S. Ct. at 2362-63; *cf. United States v. Thomas*, 284 F.3d 746, 755-56 (7th Cir. 2002) (where charged conspiracy terminated as a matter of law on a particular date, jury had to be instructed to consider whether defendant joined conspiracy before that date).

Because this issue was not submitted to the jury assessing Julian's guilt or innocence, a Sixth Amendment error occurred. This was a plain error in the sense of being an obvious mistake in retrospect. *See United States v. Thomas*, 150 F.3d 743, 745 (7th Cir. 1998) (per curiam). It also affected Julian's substantial rights in the sense that it exposed him to a longer sentence. *See Nance*, 236 F.3d at 825-26. But the question remains whether the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Id.* at 825. If a jury, properly

instructed on this point, might have found that the conspiracy had come to an end before the increased penalty took effect or that Julian had withdrawn from the conspiracy before that date, then the error is one that implicates the fairness, integrity, or public reputation of the judicial process. If, on the other hand, a reasonable jury could only have concluded that the conspiracy continued beyond the effective date of the new statute and that Julian remained a member of the conspiracy beyond that date, then this fourth element of the plain error test has not been satisfied. *Nance*, 236 F.3d at 826.

Notably, there is no real dispute that the conspiracy itself continued beyond October 30, 1998. CVM remained in operation beyond that date, Decker remained in charge of the hotel, and customers continued to patronize it. The only pertinent question is whether Julian remained a member of the conspiracy after October 30. If he was, he can be held to account for the acts of the conspiracy occurring after October 30 (and thus be subject to the increased penalty), even if he himself took no actions in furtherance of the conspiracy after that date. *Canino*, 949 F.2d at 951-52.

Having thoroughly reviewed the record, we are satisfied that no reasonable jury would have found that Julian withdrew from the conspiracy prior to October 30. As we have pointed out before, "'[i]t is not . . . all that easy to withdraw from a conspiracy.'" *United States v. Hall*, 212 F.3d 1016, 1023 (7th Cir. 2000) (quoting *United States v. Bafia*, 949 F.2d 1465, 1477 (7th Cir. 1991)), and it is the defendant's burden to show that he did, *id.* In order for a defendant to withdraw from a conspiracy in the legal sense, he must take some affirmative act to defeat or disavow the criminal aim of the conspiracy, such as submitting himself to the authorities or announcing to his co-conspirators that he is withdrawing. *E.g.*, *United States v. Wren*, 363 F.3d 654, 663 (7th Cir. 2004), *judgment vacated on other grounds*, 125 S. Ct. 1021 (2005). "Simply ceasing to

participate even for extended periods of time is not sufficient to show withdrawal." *Id.*; *see also Hall*, 212 F.3d at 1023.

The evidence bespeaks no such affirmative act by Julian. At the most, the evidence might support the inference that Julian had ceased to take steps in furtherance of the conspiracy by October 30, 1998. Julian emphasizes that he no longer lent his financial support to CVM after that date and was no longer involved in the conspiracy in any other way. Decker himself sensed a "coolness" from Julian in October 1998, would later realize that Julian no longer wished to be involved with him or CVM, and Decker bore responsibility for the last few months of rent on CVM himself. But these are merely passive acts of disengagement; they do not signal an overt disavowal of the conspiracy. Julian did not take any affirmative acts to shut down CVM or to signal to Decker that he no longer wanted any part of the (illegal) business. Julian's name remained on the lease through January 1999, and Decker remained in possession of Julian's ATM card.

Under these circumstances, no reasonable jury could have found that Julian had withdrawn from the conspiracy before October 30. Such a finding would defy the high evidentiary threshold for a finding of withdrawal. Given the evidence presented to it, the jury reasonably could only have found what the district court itself did—that Julian remained a member of the conspiracy after October 30 and that he was therefore liable for its acts, and subject to the applicable criminal penalties, after that date. Thus, although we agree with Julian that the failure to submit this question to the jury was error, it was not one that affected the fairness, integrity, or public reputation of the judicial proceedings. *Nance*, 236 F.3d at 826. Consequently, the error is not one that compels us to vacate Julian's sentence.

**B.**

Count Two of the indictment charged Julian with aiding and abetting a violation of 18 U.S.C. § 2421, which in relevant part proscribes the knowing transportation of an individual in foreign commerce with the intent that such individual engage in prostitution. This charge was based on the efforts that Julian made, at the behest of Accordini, to help Armando covertly cross the Mexican border into the United States. The principal step that Julian took in furtherance of that goal was to drive Armando to (or part of the way to) the border. Later, when Accordini and Armando needed help in completing a wire transfer of the money that Armando needed to pay the coyote who had smuggled him across the U.S.-Mexico border, Julian put them in touch with Smith.

At this juncture, Julian does not dispute that he facilitated Julian's illegal entry into the United States; rather, he challenges the notion that the purpose of Armando's entry was prostitution. Without question, Armando's sexual relationship with Accordini in Mexico was meretricious—Armando had been assigned to sexually service Accordini as a paying guest at CVM. Julian acknowledges that Armando and Accordini intended to remain sexual partners once Armando entered the United States. Nonetheless, Julian quarrels with the inference that the purpose behind Armando's entry (and Julian's intent in facilitating it) was for Armando to engage in prostitution, even though Accordini did provide Armando with shelter and spending money. As Julian sees it, this was simply a sexual relationship between two consulting adults. He points out that Armando was 19 when he crossed the border, that he was not coerced into doing so, that the idea of leaving Mexico and joining Accordini in the United States was, in fact Armando's idea. And even if prostitution may

have been an incidental purpose of Armando's entry to this country, it was not, in Julian's view, the dominant purpose, and as such it does not support his conviction under section 2421.

Of course, we are obliged to consider the evidence in the light most favorable to the government. *United States v. Carraway*, *supra*, 108 F.3d at 750. Whether Julian aided and abetted Armando's entry into the United States with the intent that he engage in prostitution was a factual question for the jury to resolve. *Stewart v. United States*, 311 F.2d 109, 112 (9th Cir. 1962). A defendant's intent may be proven through circumstantial evidence. *E.g.*, *United States v. Henningsen*, 387 F.3d 585, 591 (7th Cir. 2004). Only if no reasonable jury could have found beyond a reasonable doubt that Julian intended for Armando to engage in prostitution may we reverse his conviction. *See*, *e.g.*, *United States v. Tadros*, 310 F.3d 999, 1006 (7th Cir. 2002).

The evidence in this case readily supports the inference that Julian facilitated Armando's migration to the United States with the intent that Julian engage in prostitution. Armando and Accordini had become acquainted at what was, in essence, a house of prostitution at which Accordini had paid for the privilege of engaging in sex with Armando. Accordini himself agreed that the plan was for him to provide food, shelter, and spending money to Armando in exchange for Armando's continued willingness to engage in sex with him once he arrived in the United States. As a co-owner of CVM, Julian obviously knew how it was that Armando and Accordini had come to know one another and he was fully aware of the illicit nature of their relationship in Mexico. Having assisted Decker in recruiting boys like Armando to work as sexual servants at the hotel, Julian would have known that Armando was unable to support himself financially. Under these circumstances, the jury could reasonably infer that Julian knew and intended that

upon Armando's arrival in the United States, Accordini would continue to pay for Armando's sexual services by sheltering and supporting him.

We reject Julian's contention that prostitution must have been the sole or dominant (in the sense of being the most important) purpose of Armando's entry into the United States, and that the jury was not accurately instructed on this point. The jury was properly advised that Julian must have intended for Armando to engage in prostitution, and the evidence, as we have just stated, supports the inference that Julian did have that intent. R. 74, Instr. No. 27. That Armando may have had other reasons for wishing to enter the United States, and that prostitution may not have been Julian's sole or most important reason for helping Armando do so, does not undermine his conviction. A defendant need not facilitate someone's interstate or foreign travel with the *sole* or *principal* intent that he engage in prostitution in order to be liable under section 2421, so long as prostitution was *a* significant motive. *United States v. Snow*, 507 F.2d 22, 24 (7th Cir. 1974) (Stevens, J.); *see also United States v. Vang*, 128 F.3d 1065, 1071-72 (7th Cir. 1997). The evidence supports the inference that prostitution was a significant reason for Armando's entry into the United States.

## C.

Julian challenges the admission into evidence of his prior conviction for sexual assault of a minor. In 1988, Julian pleaded guilty to having sexually molested his stepson in 1986. The child was 11 years old at the time of the assault. Over Julian's objection, the district court allowed the government to introduce evidence concerning this conviction pursuant to Federal Rule of Evidence 413, concluding that the prior offense was relevant to Julian's knowledge and intent vis-à-vis his involvement with CVM. Feb. 11, 2003

Tr. (vol. 2) at 139-40; Feb. 12, 2003 (vol. 3) Tr. at 5.

Julian contends that the court abused its discretion in admitting evidence of this prior assault. Because the assault occurred 12 years prior to the events underlying the charges in this case, involved his stepson, and did not take place in foreign commerce, the probative value of this evidence was, in Julian's view, slight as compared to the likelihood that the evidence prejudiced him unfairly in the eyes of the jury. *See* Fed. R. Evid. 403. Julian also complains that the government was permitted to rely on this evidence, and the jury was permitted to consider it, as proof of his propensity to commit the type of crimes charged in the indictment.[7] This would be an improper purpose under Evidence Rule 404(b), as Julian points out. *See, e.g., United States v. Puckett*, 405 F.3d 589, 595-96 (7th Cir. 2005), *cert.*

---

[7] In contrast to cases in which evidence of a defendant's prior acts is admitted pursuant to Rule 404(b), the jury was not instructed to limit its consideration of that evidence to one or more purposes allowed by that rule. *Cf.* Seventh Circuit Federal Criminal Jury Instruction No. 3.04 (1999). Thus, as Julian argues, the jury was free to consider it for any and all purposes. However, we note that insofar as the government relied on this evidence in its final arguments to the jury, it urged the jury to consider the evidence for the light it shed on Julian's intent vis-à-vis CVM. Counsel for the government made the following point in her summation to the jury:

> Throughout the cross-examination of [the] government's witnesses, defense counsel has sought to establish or reply that this was nothing more than a gay resort. It was never intended, certainly by his client, that this would be a boy-lover haven. But is that reasonable to believe when the defendant himself picks as his partner a convicted—twice-convicted child molester, when the defendant himself is a convicted child molester?

Feb. 13, 2003 Tr. (vol. 4) at 29.

*denied*, 2005 WL 1786615 (U.S. Oct. 3, 2005). But the evidence of the prior assault was admitted not under Rule 404(b) but Rule 413, and the latter rule alters the legal landscape with respect to a defendant's prior crimes in cases like this one.

In criminal prosecutions charging the defendant with "an offense of sexual assault," Rule 413(a) permits a court to admit evidence concerning a prior sexual assault committed by the defendant. The rule goes on to define an "offense of sexual assault" as a crime under federal law that "involved," among other conduct, "any contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person" and "any contact, without consent, between the genitals or anus of the defendant and any part of another person's body," or an attempt or conspiracy to engage in such conduct. Rule 413(d)(2), (3), and (5). As we have discussed previously, Count One of the indictment in this case charged Julian with conspiring to travel in foreign commerce for the purpose of engaging in illicit sexual conduct with children under the age of 18, including conduct that would constitute "sexual abuse" and "sexual abuse of a minor" if they occurred in the special maritime and territorial jurisdiction of the United States. R. 1 at 1; *see* 18 U.S.C. §§ 2242(2)(A), 2243(a)(1); *supra* at 9-10. The government's proof at trial established that the acts in furtherance of the conspiracy included the forcible rape of Cesena by Julian and Decker. The government argued to the district judge, and defense counsel conceded, that Cesena's testimony regarding the rape, if believed, was sufficient to establish that Julian was charged with an offense that involved the type of involuntary sexual conduct described in Rule 413(d)(2), (3), and (5). Feb. 11, 2003 Tr. (vol. 2) at 131; *see also id.* at 139.[8]

---

[8] We are not asked in this appeal to address how broadly the

(continued...)

Rule 413 thus permitted the admission of evidence of the prior sexual assault committed by Julian. Moreover, in contrast to Rule 404(b), Rule 413(a) permits the consideration of a prior sexual assault "for its bearing on any matter to which it is relevant." The legislative history reveals that by "any matter to which it is relevant" Congress intended to include the defendant's propensity to engage in the offense of sexual assault with which he has been charged. *See* 137 Cong. Rec. 6032 (section-by-section analysis of Comprehensive Violent Crime Control Act of 1991, in which adoption of Rules 413-415 was initially proposed); 140 Cong. Rec. 23603 (statement of Rep. Molinari); *see United States v. Sioux*, 362 F.3d 1241, 1244 (9th Cir. 2004); *United States v. Gabe*, 237 F.3d 954, 959 (8th Cir. 2001); *see also United States v. Cunningham*, 103 F.3d 553, 556 (7th Cir. 1996). Additionally, the legislative history indicates that Congress intended for the lapse of time between the prior and charged offenses to pose no categorical bar to the admission of the prior assault, but rather that it represent a factor that the jury may consider in assessing the probative force of the prior assault. *See* 137 Cong. Rec. 6034 (section-by-section analysis) ("[t]here is no magic line in time beyond which similar crimes evidence generally ceases to be relevant to the determination of a pending charge"); 140 Cong. Rec. 23603 (statement of Rep. Molinari); *see also*, *e.g.*, *Gabe*, 237 F.3d at 960 (sustaining admission under companion Rule 414 of sexual abuse that occurred 20 years prior to trial); *United States v. Meacham*, 115 F.3d 1488, 1494-95 (10th Cir. 1997) (sustaining the admission under Rule

---

[8]   (...continued)

term "involved" should be construed for purposes of Rule 413. The parties assumed that an offense involved non-consensual sexual contact if such contact occurred during the course of the offense, even if the defendant has not been charged with a non-consensual act per se.

414 of prior molestation of stepdaughters that occurred roughly 30 years before charged offense). The text of the rule therefore establishes no time limit on the admissibility of prior offenses, *cf.* Fed. R. Evid. 609(b) (establishing presumption against admission of a witness's prior conviction if more than 10 years old), nor does the rule direct the court to consider the lapse of time between the prior and charged offenses in weighing the admissibility of the prior offense. That said, the date of the prior offense remains a factor for a court to consider in weighing the possibility that the risk of unfair prejudice to the defendant posed by evidence of his prior offense might counsel against admission pursuant to Rule of Evidence 403. *See Johnson v. Elk Lake School Dist.*, 283 F.3d 138, 156 (3d Cir. 2002) (quoting *United States v. Guardia*, 135 F.3d 1326, 1331 (10th Cir. 1998)); Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence*, § 162, at 54 (2d ed. Supp. 2005).

Based on the special treatment that Rule 413 accords to prior sexual assault offenses in prosecutions charging a defendant with sexual assault, Julian suggests that the rule deprives him of equal protection of the law in violation of the Due Process Clause of the Fifth Amendment. *See generally Gillespie v. City of Indianapolis*, 185 F.3d 693, 708 (7th Cir. 1999). However, Rule 413 implicates neither a fundamental right nor a suspect class. *United States v. Mound*, 149 F.3d 799, 801 (8th Cir. 1998). Consequently, the more sweeping rule of admissibility that the rule creates for a defendant's prior acts in cases involving sexual assault does not violate equal protection principles so long as the rule has a rational basis. *Id.* As the legislative history reveals, Congress enacted Rule 413 because sexual assault cases, especially cases involving victims who are juveniles, often raise unique questions regarding the credibility of the victims which render a defendant's prior conduct especially probative. *Id.*; *see also Cunningham*, 103 F.3d at 556. Its reasoning in this regard cannot be described

as irrational. *See Mound*, 149 F.3d at 801; *United States v. Castillo*, 140 F.3d 874, 883 (10th Cir. 1998) (rejecting equal protection challenge to Rule 414); *United States v. Enjady*, 134 F.3d 1427, 1433-34 (10th Cir. 1998) (under plain error review, rejecting equal protection challenge to Rule 413); *see also United States v. LeMay*, 260 F.3d 1018, 1026-27 (9th Cir. 2001) (rejecting due process challenge to Rule 414).

As we have already suggested, however, Rule 413 does not displace the court's authority pursuant to Rule 403 to exclude evidence of a prior assault if its probative value is substantially outweighed by the danger of unfair prejudice. *See* 140 Cong. Rec. 23603 (statement of Rep. Molinari); *Johnson*, 283 F.3d at 155; *Mound*, 149 F.3d at 800-01; *Guardia*, 135 F.3d at 1330; *see also United States v. Larson*, 112 F.3d 600, 604 (2d Cir. 1997) (Rule 414). Thus, the door remains open to Julian's argument that evidence of the 1986 assault was so limited in probative worth and at the same time so prejudicial to him in the eyes of the jury that the court was wrong to admit it. Of course, the district court enjoys wide discretion in admitting or excluding evidence, and our review of its evidentiary rulings is highly deferential. *E.g.*, *United States v. Duran*, 407 F.3d 828, 834 (7th Cir. 2005).

We cannot say that the district court abused its discretion in admitting evidence of the 1986 assault in view of the defense that Julian pursued at trial. Although Julian did not dispute his involvement with CVM, the defense posited that Julian understood CVM simply to be a legitimate hotel that was friendly to gay tourists rather than an illegitimate enterprise making children available to pedophiles. *See*, *e.g.*, February 10, 2003 Tr. (Decker excerpt) at 64, 66-67; February 11, 2003 Tr. (Decker excerpt) at 12-13. Against the backdrop of the defense theory, the district court thought that the 1986 molestation of Julian's stepson was relevant as to his knowledge of CVM's invidious nature and his intent. February 11, 2003 Tr. (vol.2) at 139-40. We

cannot say that the court was off the mark in this analysis. Although the 1986 incident was distinguishable from the charged offense in a number of respects, a jury might reasonably infer from the prior conviction that Julian was a pedophile and in turn surmise that his involvement with Decker and CVM was not as innocent as the defense made it out to be. We add that the government did not dwell on the prior assault: The evidence was limited to a certified copy of Julian's prior conviction and brief testimony from the police officer who investigated Julian for the underlying offense, who confirmed that Julian had been convicted of criminal sexual assault and that the victim was 11 years old at the time of the offense. February 11, 2003 Tr. (vol.3) at 22-25.

**D.**

We come finally to Julian's sentence. As we noted earlier, the district court made various factual findings at sentencing that boosted Julian's offense level and the resulting sentencing range under the Sentencing Guidelines. Julian opposed the enhancements to his offense level on the merits in the district court, arguing that they were not warranted on the evidence before the court. He did not, however, challenge the court's authority to determine the facts that resulted in the enhancements. On appeal, Julian again asserts, in passing, that several of the enhancements are not warranted on the evidence. His principal contention, however, is that the district court violated his Sixth Amendment right to have a jury, rather than a judge, make any findings that exposed him to a lengthier sentence under the Guidelines. *See United States v. Booker*, 125 S. Ct. 738 (2005). Before turning to the *Booker* argument, we shall first consider whether the district court's sentencing determinations were correct in view of the evidence and the relevant provisions of the

Guidelines. *See United State v. Dean*, 414 F.3d 725, 727 (7th Cir. 2005).

The district court selected as the offense guideline for use in calculating Julian's sentence Guidelines section 2A3.1, which applies to offenses of criminal sexual abuse. Subsection (b)(1) of that guideline calls for a four-level increase to the base offense level where the offense involved conduct described in 18 U.S.C. § 2241(a) or (b). Those provisions of the federal criminal code make it a crime for someone within the special maritime or territorial jurisdiction of the United States to knowingly cause another person to engage in a sexual act by use of force, threat, or other means (including drugging the victim or rendering him unconscious). For purposes of the guideline, then, an offense "involved" conduct of the type described in the statute if the defendant forced the victim to engage in a sexual act. U.S.S.G. § 2A3.1, comment. (n.1) (Nov. 2003). Based on the evidence presented at trial, the district court found that Julian and Decker had forcibly raped Cesena. March 2, 2004 Sent. Tr. at 122-24. Although Julian contended below that Cesena was "mistaken," *see* February 13, 2003 Tr. (vol. 4) at 38, the district court credited Cesena's testimony that Julian and Decker had forcibly assaulted him. This was a factual determination, and in the wake of *Booker*, we continue to review the district court's factual findings at sentencing for clear error. *E.g.*, *United States v. Blaylock*, 413 F.3d 616, 618 (7th Cir. 2005). We find no such error in the court's determination.

The district court found further that Julian's offense had involved victims who were younger than 12 years old and, based on that finding, increased the offense level by an additional four levels. March 2, 2004 Sent. Tr. at 138-40, 143; *see* U.S.S.G. § 2A3.1(b)(2)(A) (Nov. 2003). None of the CVM guests who testified acknowledged having engaged in sexual relations with children below the age of 12, and neither of the two young witnesses who had engaged in sex

with CVM guests were that young when they stayed at CVM. In fact, no witness had identified a boy below the age of 12 who engaged in sexual activity with CVM guests. But multiple witnesses had testified that boys younger than 12 years old (some as young as seven or eight) stayed at CVM, *e.g.*, Feb. 11, 2003 Tr. (Calderon/Cesena excerpt) at 8; Feb. 11, 2003 Tr. (vol. 2) at 77; Feb. 12, 2003 Tr. (vol. 3)at 39, and there was ample testimony that the street children recruited to stay at CVM were expected to acquiesce in the sexual appetites of CVM guests in exchange for the food, shelter, and other things that Decker and Julian promised them, *see* Feb. 11, 2003 Tr. (Calderon/ Cesena excerpt) at 9, 14-15, 27, 42-43. As David Calderon testified, "you don't get nothing for nothing." *Id.* at 27. We find no clear error in this finding.

Finally, the district court found that Julian and Decker knew or should have known that the children whom he and Decker had recruited to stay at CVM to satisfy the sexual appetites of their guests were vulnerable victims, and the court enhanced Julian's offense level by two levels based on that finding. March 2, 2004 Sent. Tr. at 130-31; *see* U.S.S.G. § 3A1.1(b)(1) (Nov. 2003). Julian asserts that the finding of vulnerability necessarily was based on the age of the children involved, and because his offense level was separately increased based on the age of his victims, *see* § 2A3.1(b)(2), Julian contends that the vulnerable victim enhancement amounts to impermissible double counting. "'[D]ouble counting occurs when identical conduct is described in two different ways so that two different adjustments apply.'" *United States v. Parolin*, 239 F.3d 922, 928 (7th Cir. 2001) (quoting *United States v. Haines*, 32 F.3d 290, 293 (7th Cir. 1994)); *see also United States v. Schmeilski*, 408 F.3d 917, 919 (7th Cir. 2005). The Guidelines themselves recognize that the vulnerable victim enhancement may be inappropriate if the defendant's offense level has already been enhanced based on the

same circumstances that would support a finding of vulnerability:

> Do not apply subsection (b) if the factor that makes the person a vulnerable victim is incorporated in the offense guideline. For example, if the offense guideline provides an enhancement for the age of the victim, this subsection would not be applied unless the victim was unusually vulnerable for reasons unrelated to age.

§ 3A1.1(b)(1), comment. (n.2).

Given the evidence before the court, the vulnerable victim enhancement did not constitute double counting. The district court itself recognized that the enhancement could not be imposed based on the age of the victims. March 2, 2004 Sent. Tr. at 131. When it imposed the enhancement, the court did so on the basis of the economic vulnerability of the victims, finding that "[Julian] purposefully pr[e]yed on desperate street children without housing and food, taking advantage of the poor and homeless children by offering shelter, housing and food." *Id.* at 130-31. The trial testimony lends ample support to this factual assessment, which in turn makes clear that the court applied the vulnerable victim enhancement based on factors other than the children's age. *See Schmeilski*, 408 F.3d at 919 ("When two enhancements address distinct aspects of the defendant's conduct, the application of both does not constitute double counting.") We note that young victims of sexual assault are not invariably vulnerable because they are homeless or without financial support, *see, e.g.*, *United States v. Kenyon*, 397 F.3d 1071 (8th Cir. 2005) (eight year-old victim molested by common-law husband of family member during overnight stays); *United States v. Reyes Pena*, 216 F.3d 1204 (10th Cir. 2000) (10 year-old victim of sexual assault was stepdaughter of defendant), nor are homeless and otherwise financially vulnerable victims of sex-related crimes invariably young children, *e.g.*, *United*

*States v. Sabatino*, 943 F.2d 94 (1st Cir. 1991) (women recruited by defendants to serve as prostitutes were otherwise out of work and in some cases had young children).[9]

Having found no error in any of the court's Guidelines calculations, we turn to the subject of *Booker* error. Julian made no kind of *Booker* objection below, so our review is again confined to one for plain error. *Booker*, 125 S. Ct. at 769; *see also United States v. Paladino*, 401 F.3d 471, 481 (7th Cir. 2005), *cert. denied*, 2005 WL 1304753 (U.S. Oct. 3, 2005). The upshot of *Booker* is that it would be a violation of a defendant's Sixth Amendment rights for a judge rather than a jury to make factual findings under a sentencing regime in which the provisions that establish the sentencing range are mandatory. 125 S. Ct. at 749-51. But the Supreme Court in *Booker* solved the Sixth Amendment problem posed by the federal Sentencing Guidelines by excising the provision of the enabling statute that compelled courts to impose a sentence within the Guidelines range except in the relatively small number of cases that met the criteria for a departure. 125 S. Ct. at 764-65. District courts remain obliged to determine the sentencing range specified by the Guidelines based on the facts of the case and to consider imposing a sentence within that range, but the Guidelines are now advisory rather than mandatory and

---

[9]  No argument has been made that the victims of so-called "sex tourism" cases like this one are typically vulnerable to exploitation in the same ways that the victims of Julian's offense were vulnerable, such that Julian's victims cannot be described as "unusually vulnerable" for purposes of this enhancement. *See* § 3A1.1, comment. (n.2); *United States v. Castaneda*, 239 F.3d 978, 981-83 (9th Cir. 2001); *Sabatino*, 943 F.2d at 103; *United States v. Footman*, 66 F. Supp. 2d 83, 94-96 (D. Mass. 1999), *judgment aff'd*, 215 F.3d 145 (1st Cir. 2000). We express no opinion on that potential argument.

sentencing judges enjoy broader discretion to impose a sentence outside the Guidelines range. *See Dean*, 414 F.3d at 727; *United States v. Williams*, 410 F.3d 397, 403 (7th Cir. 2005). Because Julian was sentenced well before the Supreme Court decided *Booker*, however, the district court understandably treated the Guidelines as binding. In that sense, an error occurred at sentencing that, in retrospect, is obvious in light of *Booker*. But we must determine whether Julian's substantial rights were affected in the sense that he was prejudiced by that error. *See Paladino*, 401 F.3d at 482-83; *United States v. Lee*, 399 F.3d 864, 866 (7th Cir. 2005). If the district court might have imposed a lesser sentence on Julian had it realized that it had the authority to do so, then he was prejudiced by the *Booker* error. *Williams*, 410 F.3d at 404; *Paladino*, 401 F.3d at 483.

Often the sentencing record does not give us adequate clues as to what the district court might have done had it sentenced the defendant with the benefit of the *Booker* decision. In those cases, we order a limited remand so that the district court may consider and answer that question. *See id.* at 483-84. If the district court on remand indicates that it likely would have imposed a sentence below the Guidelines range, then we proceed to vacate the sentence and remand for resentencing. *Id.* at 484.

In this case, however, the sentencing record is more illuminating. Based on the district court's findings as to the pertinent Guidelines factors, the Guidelines called for a sentence within a range from 324 to 405 months. However, the maximum sentence allowed by statute was 300 months, and so the court ordered Julian to serve a total prison term of that length. *See* U.S.S.G. § 5G1.2(d). The sentence imposed, then, was two years below the bottom of the range specified by the Guidelines. After *Booker*, the district court would have the authority to impose a sentence even further below the Guidelines range. But, in sentencing Julian, the district court made remarks indicating that it would not be

inclined to impose a lesser term even if had the ability to do so. In the course of calculating Julian's adjusted offense level, the court had applied a number of Guidelines enhancements (such as the three we have discussed) over Julian's objections. When the court later imposed the 300-month sentence on Julian, it observed that the sentence was a fair one. March 2, 2004 Sent. Tr. at 153. More to the point, the court also noted that, had it sustained Julian's objections to certain of the enhancements to his offense level, the Guidelines would have called for a sentence from 235 to 327 months. Had the sentencing range been that low, the court observed, it still would have sentenced Julian to a term of 300 months. *Id.* at 145.

We can therefore be confident that the district court would not be inclined to re-sentence Julian in view of *Booker*. As it was, the sentence imposed on Julian was a full two years below the bottom of the Guidelines range by virtue of the statutory maximums, and the court noted that even if it had resolved the parties' disputes over the Guidelines calculations more favorably to Julian, it would not have been inclined to impose a lesser term. range. That declaration makes clear that Julian was not prejudiced by the *Booker* error in the sense that the error caused the court to impose a lengthier sentence than it otherwise might have. There is no need for a *Paladino* remand. *See Paladino*, 401 F.3d at 482-83; *Lee*, 399 F.3d at 866-67.

The only remaining question is whether the sentence is reasonable. *See Booker*, 125 S. Ct. at 765; *Paladino*, 401 F.3d at 484. A sentence imposed in accord with the provisions of the Guidelines is presumptively reasonable. *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). "The defendant can rebut this presumption only by demonstrating that his or her sentence is unreasonable when measured against the sentencing factors set forth in [18 U.S.C.] § 3553(a)." *Id.* These include such factors as the nature and circumstances of the offense, the history and

characteristics of the defendant, and the need for a sentence that will reflect the gravity of the offense, deter criminal conduct and promote respect for the law, provide just punishment for the offense, protect the public from further crimes by the defendant, and provide the defendant with appropriate care and rehabilitative services. § 3553(a)(1) & (2). "[I]t will be a rare Guidelines sentence that is unreasonable," *Mykytiuk*, 415 F.3d at 608, and Julian's is not one of them. The district court itself considered the sentencing factors set forth in section 3553(a) and concluded that they supported a sentence at the statutory maximum, March 2, 2004 Sent. Tr. at 149-50, 153, and we cannot disagree with its assessment. As it is, Julian's sentence is two years outside of the Guidelines range by virtue of the statutory maximums, and the record reveals no circumstance suggesting that reason would demand an even lower sentence. Julian committed a horrific crime that took advantage of extremely young, vulnerable victims in a calculated fashion and went so far as to use force when one of the boys was not as cooperative as Julian and Decker wished. A lengthy sentence is required to account for the gravity of the offense and the fact that this is not the first time that Julian has victimized a child, to deter Julian and other pedophiles from engaging in this type of offense, to protect the public, and to establish a correctional environment that in the short run will prevent Julian from victimizing additional children and in the long run help him (hopefully) to build the self-restraint not to re-offend when he is released. *See* § 3553(a).

## III.

For the reasons we have discussed, we AFFIRM Julian's conviction and sentence.

A true Copy:

      Teste:

*Clerk of the United States Court of
Appeals for the Seventh Circuit*

USCA-02-C-0072—10-24-05